# FEDERAL PUBLIC DEFENDER
## DISTRICT OF NEW JERSEY

**RICHARD COUGHLIN**
FEDERAL PUBLIC DEFENDER

1002 Broad Street
Newark, New Jersey 07102

**CHESTER M. KELLER**
FIRST ASSISTANT

Hon. Cathy L. Waldor
United States District Court
District of New Jersey
50 Walnut Street
Newark, NJ 07102

December 17, 2020

Re:  *United States v. Maria Bell*, Case No. 2:20-mj-9451-CLW

Dear Judge Waldor:

Maria Bell, through undersigned counsel, respectfully moves for bond pending trial in this matter.  Ms. Bell is easily able to rebut the presumption that no combination of conditions will reasonably assure her appearance in Court or the safety of the community.  18 U.S.C. § 3142(e)(3); *see United States v. Muhtorov,* 702 F. App'x 694, 698 (10th Cir. 2017) ("The defendant's burden of production is not heavy, but some evidence must be produced.").

On November 25, 2020, Ms. Bell was arrested on the charge of concealment of support to a foreign terrorist organization ("FTO") and had her initial appearance in this case.  The government opposed granting bond, emphasizing that (1) Ms. Bell has expressed a desire to move to Turkey, (2) Ms. Bell appeared to be on her way to Turkey on the date of her arrest, and (3) approximately 136 firearms and an anti-tank rocket launcher had been found in her home when she was arrested.  The defense argued that detention was inappropriate for various reasons, including (in no particular order) that Ms. Bell was actually *not* on her way to Turkey on the date of her arrest; Ms. Bell is not alleged to have engaged in any illegal activity within the last two years; Ms. Bell has not expressed any recent desire to move to Turkey imminently; the firearms and artillery in Ms. Bell's home were her children's, inherited by their late father, and she was keeping them merely in storage as a favor to them; and Ms. Bell is willing to relinquish her passport and refrain from applying for future travel documents while this case is pending.  The Court detained Ms. Bell upon finding that she had not overcome the presumption that she is a danger to the community.  *See* ECF No. 6.  The Court said it would reconsider its decision once it obtained more clarity about Ms. Bell's intentions with respect to Turkey, and about the firearms and artillery found in her home.

In this instance, at least, the truth will out, and the truth is pretty dull.  As

---

the attached affidavits by her partner Hesham and her son Luke show, in the last two years at least Ms. Bell has expressed a vague desire to *someday* move to Turkey, and the reason the weapons were in her home is because her children did not make it a priority to dispose of the collection—a collection that no one in the family has ever viewed as particularly concerning, but as simply the late Richard Magera's hobby. *See* Ex. 1, Ex. 2.

Literally no factors support detention in this case. The defense will not get into specifics about the weight of the evidence except in an *ex parte* pleading, and only if the Court finds that factor dispositive. But suffice it to say, this case is not nearly as simple as the government would have the Court—or the media—believe, and Ms. Bell may end up being just one more cautionary tale about why it's best not to jump to conclusions based upon an accusation. On May 29, 2017, Ms. Bell described herself to a friend in an email as "rather patriotic," and complained that people "are largely into partying on Memorial Day instead of giving any solemnity to our Armed Forces." Now Ms. Bell finds herself the subject of a brutally cherry-picked Criminal Complaint and press release insinuating that she supported international terrorism beginning in February 2017. *See* ECF No. 1; U.S. Attorney's Office for the District of New Jersey, "Sussex County Woman Charged with Concealing Terrorist Financing to Syrian Al-Nusra Front, a Foreign Terrorist Organization," https://www.justice.gov/usao-nj/pr/sussex-county-woman-charged-concealing-terrorist-financing-syrian-al-nusra-front-foreign. The boilerplate disclaimer at the end of that press release—that these "are merely accusations, and the defendant is presumed innocent unless and until proven guilty"—is pure irony in this case, as Ms. Bell has not really been presumed innocent at all. Near the beginning of November, she was "[c]elebrating 9 years of working" at Morristown Medical Center as a clinical research coordinator, but on December 10, 2020, her employer terminated her position, stating: "[W]e have had the opportunity to review the criminal complaint and other documents released by the U.S. Attorney's Office. Considering the nature of charges against you, we unfortunately can't allow you to return to work . . . ."

The defense expects the discovery in this case to be voluminous: the government will need to produce years of Ms. Bell's emails, text messages, and Facebook posts, as nearly all of that information will be relevant in determining what Ms. Bell believed, in 2017 and 2018, about Syria, about Hay'at Tahrir al-Sham ("HTS"), and about her alleged contact within HTS (referred to in the complaint as "User 1"). In addition to voluminous discovery, the defense already knows that this case will require an unusual amount of investigation and research.

To keep Ms. Bell incarcerated—whether at Essex County Correctional Facility or in her home—while this lengthy case proceeds would be manifestly unjust. The evidence in this case is far from overwhelming. There is no mandatory minimum sentence for this charge, and the defense calculates that if Ms. Bell were

convicted of the charge at trial, the U.S. Sentencing Guidelines would recommend a sentence of at most 51 months in prison.  Ms. Bell has absolutely no prior criminal history, so she of course has never participated in criminal activity while on probation or court supervision, and she has no history of failing to appear in court as ordered.  She has zero history of violence.  She has no history of substance abuse.  Until this case, she had very stable employment.  She has a stable residence in Hopatcong.  Her partner is willing to co-sign a bond.  She has strong community *and* family ties to this District.  She is a U.S. citizen, not subject to deportation if she is convicted of this offense.  There is no allegation that she has ever used an alias or submitted a false document.  And her background information is verified.

As if all of these reasons were not enough, Ms. Bell is also at increased risk of severe illness if she contracts COVID-19, due to her age and body mass index.  The number of inmates in Special COVID-19 Quarantine at the Essex County Correctional Facility ("ECCF") has only *continued* to increase since the last hearing in this case.  On November 16, there were 34 inmates in special quarantine.  On November 25, there were 57 in special quarantine.  As of December 13, there are 69 inmates in special quarantine.  Clearly, concerns about exposure to the novel coronavirus are only getting worse at ECCF.

Defendants far more concerning than Ms. Bell are frequently granted release under the Bail Reform Act:  defendants facing overwhelming evidence of guilt, defendants charged with possession of a firearm after a felony conviction, defendants who resisted arrest, defendants who have openly contemplated killing others, defendants charged with criminal violations of supervised release, defendants who have failed to appear or even broken the law while on pretrial release, defendants facing harsh mandatory minimum sentences if convicted, defendants who live far outside of the District, defendants charged with using the dark web to collect child pornography, defendants who will almost certainly be deported when their case is over, the list goes on and on.  That is because the relevant inquiry is only whether the defendant poses a risk of flight and a danger to the community while the case is pending—i.e., while presumed *innocent*.

To take just two recent examples that come to mind:  In *United States v. Radulovic*, No. 1:18-cr-10172 (D. Mass.), the defendant was charged by indictment in June 2018 for anonymously posting a message online in which he made a specific threat "to bring a Remington 700 and start shooting Alt-right guys" at a scheduled rally in Boston, as a means of generating sympathy for the Alt-right movement.  *Id.*, ECF No. 3 at 2.  The defendant presented mental health issues and was ordered to undergo such treatment as directed by Pretrial Services.  Moreover, he lived in Indiana.  The government had no trouble consenting to the defendant's release to Indiana pending trial.  *Id.*, ECF No. 10.  Trial did not occur until January 2020.  On January 16, 2020, a jury acquitted the defendant.  *Id.*, ECF No. 85.

In *United States v. Ziobrowski*, No. 1:18-cr-250 (D. Mass.), meanwhile, the defendant was charged by indictment in August 2018 for offering, on Twitter, "$500 to anyone who kills an [ICE] agent." *Id.*, ECF No. 3 at 2.  Apparently, the defendant had previously tweeted about his desire to "slit" Senator John McCain's throat, and stated that "Guns should only be legal for shooting the police like the second amendment intended." *Id.* at 1.  The defendant was arrested in the Southern District of New York, but released by the Court for his initial appearance in Massachusetts. *Id.*, ECF No. 15.  At his appearance on September 6, 2018, he was released to live in New York, apparently without any objection from the government. *Id.*, ECF No. 16.  Weeks later, on October 23, 2018, following a sealed memorandum from Pretrial Services, the Court issued an Order for defendant's counsel to "review the conditions of release regarding cell phone / internet access with his client." *Id.*, ECF No. 25.  Still, there was apparently no clamoring for the defendant to be detained by the government.  Trial did not commence until December 2019.  On December 6, 2019, a jury acquitted the defendant. *Id.*, ECF No. 88.

As with *Radulovic* and *Ziobrowski*, trial in this case may not commence until well over a year from now, and may result in acquittal.  Unlike the defendants in those cases, Ms. Bell lives within this District and there is no allegation that she has ever threatened to harm anyone.  Try as the government might to depict Ms. Bell as a gun-obsessed ex-military commando hellbent on moving to the Middle East to support terrorism, Ms. Bell is actually a 53 year-old biologist who strives to show "solemnity to our Armed Forces" on Memorial Day, and who tries to keep in close contact with her sons and grandson.  It won't get headlines, but that's the truth.

For the foregoing reasons, the Court should release Ms. Bell while this case is pending, with as few restrictions as possible.

Respectfully submitted,

/s/ Rahul Sharma, AFPD
(973) 320-7350
rahul_sharma@fd.org

4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:20-mj-9451 |
| | ) | |
| v. | ) | Hon. Cathy L. Waldor |
| | ) | |
| MARIA BELL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF LUKE MAGERA

I, Luke Magera, declare under penalty of perjury as follows:

1.     I am one of Maria Bell's two sons.   I am 26 years old and work as a biomedical engineer.   I live in Elmwood Park, New Jersey, with my wife and son.

2.     My parents, Maria Bell and Richard Magera, divorced when I was a young child but maintained a good relationship.   When my father was diagnosed with brain cancer in 2012, my mother took care of him until his death on April 19, 2013.

3.     My father worked as a quality engineer for the Department of Defense at Picatinny Arsenal in Dover, New Jersey.   He told me that much of his time was spent testing howitzers and other weapons.   In his spare time, he was an avid collector of firearms.   Most of the guns he collected were antiques.   He had an interest in weapons used during historic battles such as during the Civil War.   He also liked to collect bayonets, original leather goods that might be worn by soldiers,

1

and representative cartridges that would have been used in such firearms.   Until around 2009 he documented his antique gun purchases in Excel documents, though later in life he was not as diligent about keeping this list updated.   My understanding is that these antique guns were collected purely for historical purposes and he had no intention of ever firing them.   In fact, he told me once that because of the antique guns' age and condition, firing one could break it and render it worthless.

4.     My father also kept a few non-antique guns, including pistols, in his house, which was in a rural part of Sandyston, New Jersey, in case a wild animal entered the property.

5.     My understanding is that the FBI found a trove of firearms, including an anti-tank rocket launcher, in my mother's basement in two safes.   While I have not had an opportunity to inspect the firearms, I believe all of them were inherited by me and my brother Kyle after my father died intestate.

6.     I remember my dad showing us his firearm and artillery collection on many occasions.   I specifically remember the rocket launcher, which he left out of the safes because—in his judgment, at least—it was inert.   My father even let my brother and I play with the rocket launcher one time, when we were around grade school age.

7.     My dad purchased the safes to store the guns at his house.   After he died, I left one of them unlocked because it was a combination lock and, although I

eventually found the combination, I did not know for sure how to properly input it. The other safe had a key lock so I felt comfortable keeping it locked.

8.      I had just turned 19 and was a freshman in college when my father passed away in April 2013.   I was extremely busy, dealing with intense grief, and far from home.   Moreover, my father's house—which was now my brother's and mine—was full of his possessions and difficult to clean.   For these reasons, I was not able to sell the house until around October 2017, when I was 23 years old.

9.      On or around September 13, 2017, Kyle and I transported the collectibles we inherited, including the firearms and artillery, to my mom's basement in Hopatcong.   My mother allowed the items to be kept in her basement as a favor to me and Kyle, since neither of us had any room, or desire, to keep them. We didn't know how to dispose of the guns in a way that was both legal and that would honor our father's memory.   The three of us discussed various options, including possibly finding a museum to take them.

10.     I took responsibility for the task of disposing of the guns, but I didn't make it a priority for a variety of reasons that I now regret:   I was living in Hempstead, Long Island, till around summer 2018, which was about a 2.5 hour drive from my mother's home in Hopatcong.   Around that time, my wife and I moved back to New Jersey, but we were always still well over an hour's drive from my mother's home.   Until November 2019, when I received a promotion, I worked extremely long hours in Manhattan.   During much of 2019, my wife was pregnant

3

and I sought to spend what little free time I had with her.   Our son was born in January 2020, which left even less time or mental space for dealing with the issue of the military equipment that my brother and I had inherited.

11.   My mother expressed reservations about keeping the military equipment in her basement.   My mother has always been open with me about her interests, and she has never expressed any interest in my father's weapon collection.   Moreover, my mother would occasionally make statements to the effect that she would like to have the space in her basement back.

12.   In February 2020, my mother's partner Hesham and my brother Kyle tried to help me in disposing of the firearms.   Hesham got in touch with a lawyer in New Jersey known for specializing in gun law, and eventually received an inquiry from a gun afficionado interested in perusing the contents of the safes in my mother's basement.   Hesham asked my brother in mid-February to follow up with the prospective buyer, but it does not appear that this happened prior to the COVID-19 pandemic.

13.   In early November 2020—well before the arrest in this case—my mother texted me to follow up about "the guy [the lawyer] recommended to purchase Dad's stuff."   I have attached these text messages.

14.   Until the pandemic lockdown began, my mother would visit my child, her grandson, about every other week, despite the distance between us.   She continued to visit occasionally during the pandemic, but we would typically remain

4

outside.   The last time she visited us was just a few days before she was arrested in this case.   She said that she was excited because her job was allowing her to take a few weeks off for a vacation in the Middle East.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 16, 2020          /s/ Luke Magera

5



# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:20-mj-9451 |
|  | ) |  |
| v. | ) | Hon. Cathy L. Waldor |
|  | ) |  |
| MARIA BELL, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**<u>AFFIDAVIT OF HESHAM EL-MELIGY</u>**

I, Hesham El-Meligy, declare under penalty of perjury as follows:

1.      I am 49 years old and have worked for over 5 years as an Examiner for the New York State Department of Financial Services.   My job is to audit insurance companies for compliance issues and enforce applicable financial regulations.

2.      I have been in a relationship with Maria Bell since January 2019.

3.      My legal address is on Staten Island, but since the COVID-19 pandemic began I have been living with Maria in her house in Hopatcong.

4.      Maria and I were planning to go on a vacation to Turkey, Egypt, and Saudi Arabia on November 25, 2020.   Turkey was for sightseeing, relaxing, and shopping.   In Egypt, Maria was going to meet my family for the first time.   Then to Saudi Arabia to see religious sites.   However, around November 18, we learned that there would be severe restrictions on activities in Turkey due to an increase in

1

COVID-19 cases in the country.   Thus, on November 23, 2020, we changed our airline tickets to cancel the Turkey portion of the trip.

5.      Any suggestion that Maria intended to do anything illegal, or even questionable, during the trip is totally untrue.   Maria is not who the government has tried to make her out to be.   In an email from October 26, 2020, when we were still planning to go to Turkey, Maria wrote to a friend:

> My biggest deal is in Turkey as I am really anxious to see friends and meet the lady in my favorite cooking channel.   And food and spa and just soaking up the atmosphere.   Hesham is having a hard time with my requests for Saudi [Arabia], lol.   I want to see secular things in addition like a day trip to Riyadh and seeing the new polo grounds and lunch at one of the new golf clubs.

6.      Since January 2019, Maria had shared with me her love of vacationing in Turkey.   She expressed a desire to live in Turkey at some point, but never explained any concrete plans to do so.   We discussed and agreed that unless she found a good paying job, was able to purchase an apartment there, and developed a good grasp of the Turkish language, it would be almost impossible to fulfill her desire.   None of those items would have been attainable in the short term, if at all.

7.      Maria was planning on returning to work at Morristown Medical Center after our vacation on the Monday after Christmas.

8.      Maria and I had a Southern Caribbean cruise booked for February 11, 2021, to February 21, 2021, because we love to travel and were going to celebrate our second anniversary.   On November 28, 2020, after discussing with Maria's

2

public defender, I canceled our cruise reservations.

9.      This year, Maria has served as a mentor to two students at William Paterson University's Career Development Center.   I have seen her on many Zoom and phone calls with the students, talking to them about how to create effective resumes and LinkedIn pages, and how to find internships and jobs.   She cares deeply about her position as a mentor at William Paterson, and about helping students in general.   (She was an adjunct professor of biology for several years at Sussex County Community College.)

10.      Until her arrest, Maria had been working to improve her home in Hopatcong.   In July 2020, she bought a new washer and dryer from Costco, because she was tired of always having to take laundry to the laundromat.   On September 4, 2020, she took out a loan of more than $25,000 in order to have a new roof and solar panels installed.

11.      Maria cares a lot about her children, who both live in New Jersey, and about her grandson, who was born in January of this year.   She has often shown me pictures and videos of her grandson.

12.      Before the pandemic, I attempted to facilitate getting rid of the large safes in Maria's basement containing guns and artillery that her children inherited from their late father.   Maria did not want the safes there and only kept them as a favor to her children.   In or around January 2020, I communicated with a lawyer, who recommended a licensed gun dealer.   In February and March of this year, I

3

attempted to get one of Maria's sons to coordinate with the gun dealer to see if he would take the safes.   Once the pandemic started, however, everything came to a halt.

13.     The entire time I've known Maria, I have never seen her open the above-mentioned safes or handle any weapons, from the safes or otherwise.   Nor have I ever heard her express any interest in weapons.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 17, 2020          /s/ Hesham El-Meligy

4