**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **RICHARD COUGHLIN**<br>FEDERAL PUBLIC DEFENDER | 1002 Broad Street<br>Newark, New Jersey 07102 | **CHESTER M. KELLER**<br>FIRST ASSISTANT |

Hon. Cathy L. Waldor
United States District Court
District of New Jersey
50 Walnut Street
Newark, NJ 07102

December 21, 2020

Re:  *United States v. Maria Bell*, Case No. 2:20-mj-9451-CLW

Dear Judge Waldor:

    Attached are affidavits from Ms. Bell's sons, Kyle and Luke, providing further information about the firearms and artillery found in her basement.

    In an email to chambers this afternoon, the government stated:  "Notably, the government has received information regarding the defendant's travel plans leading up to her arrest *that all parties should have*."  The government then drops the purported bombshell that in Ms. Bell's "original itinerary," a reservation was "made with the end destination being Turkey, departing on the day she arrived in Egypt."  The defense *already told the Court that the first destination of Ms. Bell's original itinerary was Turkey*, in Hesham El-Meligy's sworn Affidavit.  ECF No. 9 at 13.  Turkey, however, was *not* the "end destination":  the government is omitting critical facts—a serious problem in the Complaint as well—and omitting that the original itinerary then went back to Egypt and Saudi Arabia.  If the Court wishes to see the original itinerary, counsel will provide it.  As for the fact that the flight was "departing on the day she arrived in Egypt," the defense fully admits that:  it's known as a "layover," and the reason it was in Egypt was because Egypt Air was the airline and Cairo is its main hub.

    Within the last hour the government revealed it will also "reference" various text messages between Ms. Bell and User 1 from August 2019.  These text messages prove nothing.  The government must show that Ms. Bell provided material support and knew HTS was a foreign terrorist organization in order to prove the instant charge.  18 U.S.C. § 2339B.  Neither of those prongs will be satisfied by texts like "Do you remember I said you were a leader?  Do not forget that.  Leading a family is the first step, then you provide guidance in the community."  Given that people are frequently released on bail who have very recently planned crimes with fellow drug dealers and gangsters *in their own communities*, the defense fails to see how these

---

800-840 Cooper Street, Suite 350, Camden, New Jersey 08102 (856) 757-5341

22 South Clinton Avenue, Station Plaza 4, 4th Floor  Trenton, New Jersey 08609 (609) 989-2160

text messages advance the government's argument regarding bail, unless the government's argument is "Isn't it scary that this white lady is talking to a Muslim?!"

  The defense worries that all of this clarification and protestation makes this seem like a close case for bond.  The defense respectfully submits that it is <u>not</u>.  *See* ECF No. 9 at 2-3.  As already stated, people far, far more concerning than Ms. Bell are routinely released, without any fanfare, under the Bail Reform Act.  *Id.*  The defense submits that this case only seems close thanks to years and years of media implying that (1) only a zealot would ever want to leave the West to move to Turkey someday, and (2) once something becomes a "terrorism case"—even if, like this one, it does not concern a domestic terror plot in any manner whatsoever—the case is radically different and the government should be allowed to have its way.  That is <u>not</u> what the Bail Reform Act says.  The Bail Reform Act does not say that the instant charge against Ms. Bell—which, the defense calculates, carries a maximum Guidelines recommendation of only 51 months in prison if she is convicted—mandates detention.  It says that there is a rebuttable presumption of detention—a presumption that Ms. Bell is easily able to overcome, certainly more able to overcome than defendants charged with making death threats or with felon-in-possession and similar crimes.

  For the foregoing reasons, Maria Bell deserves bond—easily, and with the least restrictions possible.

Respectfully submitted,

/s/ Rahul Sharma, AFPD  
(973) 320-7350  
rahul_sharma@fd.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case No. 2:20-mj-9451 |
| v. ) | Hon. Cathy L. Waldor |
| MARIA BELL, ) | |
| Defendant. ) | |

## AFFIDAVIT OF LUKE MAGERA

I, Luke Magera, declare under penalty of perjury as follows:

1. I wish to provide some additional information for the Court's consideration, in part because I unfortunately will not be able to attend my mother's bond hearing at 4 p.m. today.

2. The way the firearms and artillery were stored in my mother's basement was almost exactly how my father kept that equipment in his home before he passed away. We simply moved the safes and crates from his home to hers after my brother and I sold his. We were never taught that there was any special way to store the firearms, antique or otherwise. Due to the nature of my father's work and his hobby of collecting guns, my family grew up with lots of firearms and other military equipment in our house, and having them around was completely normal for us. The only person who was really interested in them was my late father. Among my father, mother, my brother, and me, I would say that

1

my mother was the least interested of the four of us in my father's collection.  I reiterate that she only kept the equipment in her basement as a favor to me and my brother Kyle, while we figured out a way to dispose of them that would be legal and honor my father's memory.  We regret not making this task more of a priority, given the way it has affected our mother.

3.      I am at least partly responsible for how the equipment was found in my mother's basement.  Although my father usually kept both safes locked, I told my mom to keep the safe with the combination lock unlocked because I was not sure we would be able to get it open again if it was locked.

4.      The last time I remember being in my mother's basement was around September 2020, when I came to pick up some gemstones that my father had collected to show a gemstone collector (who purchased some of them).  When I went down into the basement, I recall seeing the safes and crates from my father's home, and that everything looked exactly how it always did, not as if anyone had touched any of the firearms.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 21, 2020            /s/ Luke Magera

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:20-mj-9451 |
| v. | ) | Hon. Cathy L. Waldor |
| MARIA BELL, | ) |  |
| Defendant. | ) |  |

**AFFIDAVIT OF KYLE MAGERA**

I, Kyle Magera, declare under penalty of perjury as follows:

1. I am one of Maria Bell's two sons. I am 29 years old. I work full-time as a UPS driver and live in Newark, New Jersey. I will unfortunately not be able to attend the bond hearing at 4 p.m. today, but I wish to state that everything my brother Luke has told the Court comports with my recollection. Moreover, my mother independently told me well before her arrest in this case, and more than once, that she would like the safes containing my father's firearms, which my brother and I inherited, removed from her basement.

2. My mother kept the firearms and artillery that my brother and I inherited in her basement as a favor to us, and it was our responsibility to get rid of them, but we did not make it a priority. My mother had no interest in the firearms or artillery beyond making sure they were disposed of in a way that was legal and

1

that honored my father.   Her interest was the same as my brother's and mine.


Executed on December 21, 2020                    /s/ Kyle Magera