UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:20-mj-9451 |
|  | ) |  |
| v. | ) | <u>HEARING REQUESTED</u> |
|  | ) |  |
| MARIA SUE BELL, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**<u>EMERGENCY MOTION TO REVOKE ORDER OF DETENTION</u>**

Maria Sue Bell, through counsel, moves to revoke the Order of Detention issued by U.S. Magistrate Judge Cathy L. Waldor on November 25, 2020.   Counsel respectfully requests a *de novo* hearing before the District Court as soon as possible. *See* 18 U.S.C. § 3145(b) (stating that a motion to revoke "shall be determined promptly").   The bond hearing transcripts are attached as Exhibits 1 and 2.

Ms. Bell is charged with concealing material support of a foreign terrorist organization.   It is a uniquely serious accusation, as combating terrorism is "an urgent [governmental] objective of the highest order."   *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).   This is therefore the quintessential "hard case" that tests the legal system and has the potential to make bad law, since such cases "exercise a kind of hydraulic pressure which makes what was previously clear seem doubtful, and before which even well settled principles of law will bend."   *Northern Securities Co. v. United States*, 193 U.S. 197, 401 (1934) (Holmes, J., dissenting).

1

The defense believes this pressure is already showing.   The Magistrate's bond determination was manifestly unfair and should be reversed.   *Cf. United States v. A-Hady*, Case No. 2:20-cr-45, ECF No. 5 (D.N.J. Jan. 29, 2020) (reversing Magistrate's denial of bond).   At stake is not only Ms. Bell's liberty while she is "shielded by the presumption of innocence"—a presumption that is especially appropriate here given the weakness of the government's case.   *Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016).   Also at stake is whether well settled principles of law regarding pretrial release will stand firm, or will bend.

I.   Background

   A.   Substantive Allegations

On November 24, 2020, the government filed a Complaint charging Ms. Bell with concealing material support she provided between February 2018 and November 2018 to a foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339C(c)(2)(A).   ECF No. 1 at 2.   The FTO she allegedly provided material support to is Hay'at Tahrir al-Sham ("HTS"), which is alleged to be a pseudonym for al-Nusra Front ("ANF").   *Id.*   During the times relevant to Ms. Bell's charge—February 2018 to November 2018—HTS was one of several rebel groups fighting the regime of Syrian dictator Bashar al-Assad.   *See generally id.* at 3-4.   HTS was designated an FTO by the U.S. government on or about May 30, 2018.   *Id.* at 3.

Section 2339C(c)(2)(A) penalizes anyone who "knowingly conceals or disguises the nature . . . of any material support or resources . . . knowing or intending that

2

the support or resources are to be provided . . . in violation of section 2339B of this title."   Section 2339B penalizes anyone who "knowingly provides material support or resources" to an FTO.   § 2339B(a)(1).   "To violate [§ 2339B], a person must have knowledge that the organization is a designated terrorist organization . . . or that the organization has engaged or engages in terrorism . . . ."   *Id.*   Thus, to convict Ms. Bell of the instant charge, the prosecutor must prove that she (1) knowingly provided support to HTS; (2) knowingly concealed the nature of that support; and (3) knew HTS was an FTO or had engaged in terrorism.

The Complaint alleges that Ms. Bell advised an HTS member in March 2017 about what kind of gun he should buy.   ECF No. 1 at 14-20.   The Complaint refers to this HTS member as "User 1," but the limited discovery provided by the government thus far identifies him as a man named Abdullah.   The Complaint omits what defense counsel has learned from discovery:   that Ms. Bell only gave this advice regarding the gun in response to Abdullah's text that he needed "a gun for self-defense."[1]   The Complaint also omits that Ms. Bell wrote to Abdullah:   "My wish is that you will not seek fighting.   That the weapon be only for self-defense." These omissions aside, the Complaint does not charge Ms. Bell for advice concerning the gun, only for support she allegedly provided between February 2018 and November 2018.   *Id.* at 2.

---

[1] If the Court wishes, counsel can provide this discovery, along with any other documents referred to in this pleading, for *in camera* review.

The discovery shows that Ms. Bell and Abdullah texted about his involvement in HTS in February and March 2017.   The discovery does not show any indication of Abdullah's involvement in HTS between April 2017 and July 2018. In August 2018, Ms. Bell allegedly texted Abdullah "that he had done one thing he wished:  'to rejoin HTS and be active again.'"   *Id.* at 11.

The Complaint alleges that between February 2018 and November 2018, Ms. Bell sent payments totaling about $3,150 to Abdullah via Western Union.   *Id.* at 25.   Ms. Bell allegedly sent most of these payments to Abdullah through his brother.   *Id.*   According to the Complaint, in September 2018 Ms. Bell said that she did not want her Western Union account "watched more closely than it is already," and that "[e]ach time I withdraw money, it is noted because Western Union is trying to track fraud and terrorists for the government."   *Id.*   The Complaint's affiant, FBI Special Agent Matthew Hohmann, states:   "Based on my training, experience, and involvement in this investigation, I believe that Bell was sending payments to User 1 through associates to conceal the intended recipient from U.S. law enforcement."   *Id.* at 26.

In addition to the payments to Abdullah, the Complaint alleges that in August 2018, Ms. Bell told him that HTS leaders should not talk to American journalists because they often write articles against Islam and HTS.   *Id.* at 11-12. In November 2018, Ms. Bell is alleged to have texted Abdullah that she would help him "succeed with his responsibilities as a trusted man" in HTS.   *Id.* at 13.   That

4

same month, Ms. Bell allegedly planned to meet Abdullah in Turkey.   *Id.* at 22-23.

The Complaint does not allege that Ms. Bell knew HTS was designated an FTO by the Secretary of State around May 30, 2018.   Nor does the Complaint allege that Ms. Bell knew HTS was a pseudonym for ANF.[2]

B.   Procedural History

On November 25, 2020, Ms. Bell was arrested and had a contested bond hearing before the Magistrate.   ECF No. 3.   The Magistrate ordered Ms. Bell detained upon finding that she presented a danger to the community.   ECF No. 6; *see also* Ex. 1 at 21:17-19.

On December 17, 2020, counsel filed a formal Motion for Bond, including affidavits from Ms. Bell's adult son Luke and her partner Hesham.   ECF No. 9.

On December 21, 2020, counsel filed supplemental letters and affidavits, including one from Ms. Bell's other adult son, Kyle, in support of the Motion for

---

[2] Some background on the government's allegation that HTS is a pseudonym for ANF:   According to a report found on the Department of Justice's website, HTS was created in January 2017 and "claimed it [was] a new, independent entity, not a continuation of [any] prior organisation" such as ANF.   Int'l Crisis Group, "The Best of Bad Options for Syria's Idlib," Mar. 14, 2019, at 7, https://www.justice.gov/file/1157211/download.   Notably, the report on DOJ's site has a section titled "HTS's ambiguous identity."   *Id.* at 13.   That section states: "Many Syrians—whether or not informed—believe that HTS is divided internally between rival currents of pragmatist 'doves' and hard-line 'hawks.'"   *Id.* at 14. According to one Syrian rebel, there is visible "confusion inside HTS."   *Id.* at 14 n.76 (emphasis added).   In December 2018, a former rebel commander said: "[HTS] changes colours according to the stage they're in. . . .   So what is HTS? . . . Now, no one knows."   *Id.* at 16.

5

Bond.   ECF Nos. 10, 11.   Later that day, the second bond hearing was held on

short notice.   ECF No. 12.   The U.S. Marshal was not notified to produce Ms. Bell

for the hearing.   Counsel waived Ms. Bell's appearance.   *Id.*   At the conclusion of

the hearing, the Magistrate issued an oral Order denying the Motion for Bond,

again finding that Ms. Bell presents a danger to the community.   *Id.*; *see also* Ex. 2

at 31:8-11.

On December 23, 2020, counsel filed a Notice of Appeal of the Magistrate

Judge's denial of bond.   ECF No. 13.   The Magistrate granted counsel 14 days

from the date of receipt of the hearing transcripts to appeal the denial.   ECF No.

15.   On December 31, 2020, counsel received the transcripts.

II.   Relevant Law

   A.   The Bail Reform Act

Under the Bail Reform Act ("BRA"), pretrial detention is appropriate when a

Judge finds (1) by a preponderance of the evidence, that no conditions of pretrial

release can reasonably assure the appearance of the defendant at trial; or (2) by

clear and convincing evidence, that no conditions of pretrial release can reasonably

assure the safety of the community while the case is pending.   18 U.S.C. §

3142(e)(1); *United States v. Himler*, 797 F.2d 156, 160-61 (3d Cir. 1986).   Detention

without trial is a "carefully limited exception" to the "norm" of liberty under the

Fifth Amendment's Due Process Clause.   *United States v. Salerno*, 481 U.S. 739,

755 (1987).   The BRA falls within that carefully limited exception if its provisions

are followed.  *Id.*  Because courts can "set whatever restrictions on release are necessary" to reasonably assure a defendant's appearance and the community's safety, "bail should be denied under the Bail Reform Act *only as a matter of last resort.*"  *Gov't of Virgin Islands v. Leycock*, 678 F.2d 467, 469 (3d Cir. 1982) (emphasis added).  "The structure of the [BRA] mandates every form of release be considered before detention may be imposed."  *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985).

The BRA sets out various conditions which courts may use to reasonably assure appearance and safety.  § 3142(c).  For example, a court may require a defendant to:  reside with a third-party custodian who agrees to report any violation of a release condition; abide by restrictions on travel; report on a regular basis to U.S. Pretrial Services; comply with a curfew; live under home detention; wear a location-monitoring device; agree not to possess a firearm; and/or have a third party co-sign an appearance bond.  *See id.*  The BRA only requires "conditions that will 'reasonably' assure appearance [and safety], not guarantee [them]."  *United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996) (per curiam); *accord Orta*, 760 F.2d at 891-92.

Because there is probable cause to believe that Ms. Bell violated § 2339C(c)(2)(A), a presumption arises that no conditions of pretrial release will reasonably assure her appearance in Court and the safety of the community.  18 U.S.C. § 3142(e)(3).  However, that presumption is subject to rebuttal by Ms. Bell.

*Id.*   In drafting the BRA, Congress did not make the presumption of detention any stronger, or the defendant's ability to rebut it any weaker, in a § 2339C case than it is in cases alleging receipt of child pornography or drug trafficking—"presumption" cases in which defendants are routinely granted pretrial release.   *See id.*

To rebut the presumption of detention in this case, Ms. Bell "must produce some credible evidence forming a basis for [her] contention that [s]he will appear and will not pose a threat to the community."   *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (per curiam).   If Ms. Bell is able to produce such evidence, the government must prove that no conditions will reasonably assure her appearance, by a preponderance of the evidence, and no conditions will reasonably assure community safety, by clear and convincing evidence.   *United States v. Livingston*, 2016 WL 1261464, at *2 (D.N.J. Mar. 31, 2016); *see also Himler*, 797 F.2d at 160-61.

Section 3142(e)(3) "shifts to the defendant only the burden of producing evidence"; the "burden of persuasion" on risk of flight and danger to community safety is "always with the government."   *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).   The "preponderance of the evidence" standard requires the government to prove that, no matter what conditions of release are imposed by the Court, it is more likely than not that a defendant will flee.   *See Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018).   By contrast, the "clear and convincing evidence" standard requires the government to prove that, no matter what

conditions of release are imposed, it is "highly probable" that a defendant will violate the safety of the community. *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

The difference between these standards of proof is not an "empty semantic exercise." *Addington v. Texas*, 441 U.S. 418, 425 (1979). "In cases involving individual rights, whether criminal or civil, the standard of proof at a minimum reflects the value society places on individual liberty." *Id.*; *see also Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) ("The function of a standard of proof . . . is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."). Accordingly, a "clear and convincing evidence" standard is mandated in "government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma," such as proceedings to place an individual under civil commitment, to denaturalize a citizen, or to terminate parental rights. *Santosky v. Kramer*, 455 U.S. 745, 756 (1982). The Supreme Court has emphasized that in such determinations, relying on the government's "good intentions" about what it seeks is not enough. *Id.* Instead, "the private interest affected is commanding," making a "clear and convincing" standard of proof necessary for the proceeding to comport with due process. *Id.* at 758. Thus, because of the liberty interest and stigma involved in finding that, no matter what conditions are imposed, a defendant will violate the safety of the

9

community on pretrial release, Congress imposed a clear and convincing standard of proof for such determinations under § 3142.

In determining which conditions of pretrial release, if any, will reasonably assure the appearance of a defendant and the safety of the community while a case is pending, the Court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger that would be posed by the person's release.   § 3142(g).   If the Court orders a defendant detained, it must "include written findings of facts and a written statement of reasons for the detention."   § 3142(i).

B.   Standard of Review

"If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."   § 3145(b).   "The motion shall be determined promptly."   *Id.*   "A court reviewing a detention order under § 3145(b) must make a *de novo* assessment of whether bail is warranted."   *United States v. Harry*, 2020 WL 1933990, at *2 (D.N.J. Apr. 22, 2020); *see also United States v. Perry*, 788 F.2d 100, 107 (3d Cir. 1986) (noting that § 3145(b) "authorizes the district court to hold a *de novo* hearing").   The District Court is thus "unfettered" in its assessment, and "not constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer."   *United States v. Delker*, 757 F.2d 1390, 1394

(3d Cir. 1985).   While "[i]n most cases the district court will find it useful to consider carefully the decision and reasoning of the magistrate," the court need not "specifically detail[] which portions," if any, "of the magistrate's reasoning were incorrect."   *Id.* at 1395.   "It is sufficient that the district court fully explain[] the result it reached and the reasons for it."   *Id.*

III.   <u>The Decision and Reasoning of the Magistrate</u>

   A.   <u>First Bond Hearing</u>

   At the end of the first bond hearing on November 25, 2020, the Magistrate Judge found that Ms. Bell was not a flight risk.   *See* ECF No. 6; Ex. 1 at 21:16-17. However, the Magistrate found that Ms. Bell presents a danger to the community, relying on the following three pieces of information:   (1) the FBI reportedly found over 135 firearms at Ms. Bell's residence, Ex. 1 at 21:5-7; (2) the Complaint contained remarks by Ms. Bell "that seem to be advis[ing]" an alleged member of HTS "with respect to the use of weapons," *id.* at 21:14-15; and (3) in 2018 Ms. Bell indicated she wished she could live in Turkey, *id.* at 21:8-9.   The Magistrate accepted that the firearms in Ms. Bell's residence were inherited by her sons when their father—Ms. Bell's former husband—died.   *See id.* at 20:22-24.   The Magistrate also accepted that Ms. Bell's sons asked her to keep the guns in her basement until they could find a way to get rid of them.   *See id.*   Still, the Magistrate said:   "[I] think at this point, without more information[,] that [Ms. Bell] is a danger to the community, tying together all of these different

11

components." *Id.* at 21:17-20.   Before reaching this decision, the Magistrate said:

> It's a little worrisome to me that somebody would leave in their house
> for a couple of years all of this weaponry[,] and some of it sounds pretty
> serious[,] and not do anything about it.   I mean if . . . the house was
> burglar[ized] the weapons could be out on the streets, but that's not my
> concern.

*Id.* at 20:24-21:4.   The Magistrate Judge concluded the hearing by saying, "[I] want

to keep this case for future consideration of bail application . . . ."   *Id.* at 23:2-3.

B.   <u>Second Bond Hearing</u>

Prior to the second bond hearing, counsel submitted a formal Motion for

Bond.   ECF No. 9 at 1-4.   In support of the Motion, counsel submitted four sworn

affidavits—two from Ms. Bell's son Luke, one from her son Kyle, and one from her

partner Hesham.   *Id.* at 5-16; ECF No. 11 at 3-6.   To some degree, all of the

affidavits talked about how (1) Ms. Bell only kept the gun collection found in her

home as a favor to her 20-something children, who did not have the room, or desire,

to keep this part of their inheritance in their own homes; and (2) Ms. Bell requested

that her children remove the collection for quite some time, and since at least

January 2020 there were earnest efforts to fulfill her request.   ECF No. 9 at 5-16;

ECF No. 11 at 3-6.   Counsel also submitted a screenshot of a text message from Ms.

Bell to Luke weeks before her arrest asking him to follow up with someone who

might be interested in purchasing the gun collection.   ECF No. 9 at 11.   The

affidavits also showed that Ms. Bell had no intention of leaving her home of 7 years

in Hopatcong, NJ, in the foreseeable future, as evidenced by conversations she had

had with Hesham, recent home renovations she had done, large appliances she had

recently purchased, and, last but not least, her total adoration of her infant

grandson.   *See* ECF No. 9 at 9-15.

Notwithstanding this evidence, at the second bond hearing, the Magistrate

Judge concluded that, because Ms. Bell's sons had not yet gotten rid of the guns in

the basement like she had asked them to, it must really be the case that Ms. Bell

"didn't want to get rid of them."   Ex. 2 at 26:4.   Specifically, the Magistrate stated:

> [I] mean 135 weapons in her home.   I—I just—it just makes no sense
> to me whatsoever.   What makes sense to me is that she didn't want to
> get rid of them.   She didn't push her sons to get rid of them.   Why?   I
> don't know.

*Id.* at 26:1-5; *see also id.* at 24:8-12 ("I don't understand how a person with any

sense whatsoever doesn't make arrangements with her sons, her children[,] to get

rid of the guns if she had no interest in the guns.").   Counsel offered to present

additional text messages, if necessary, to support the sons' sworn affidavits saying

that Ms. Bell *did* push them to get rid of the gun collection, but they had simply not

obeyed her.   *Id.* at 27:15-21.   The Magistrate did not ask to see any more evidence.

The Magistrate further stated:

> [I] have a very large problem when a mother keeps a stash of 135 guns
> and ammunition.   Didn't even call the police to say can you take this
> ammunition.   *I said this last time.*   If somebody broke into that house
> it would be terror on the streets because of . . . 135 weapons . . . and
> ammunition.

*Id.* at 24:3-8 (emphasis added).[3]   As noted earlier, at the first bond hearing the Magistrate had actually said:   "I mean if . . . the house was burglar[ized] the weapons could be out on the streets, *but that's not my concern*."   Ex. 1 at 20:24-21:4 (emphasis added).

The Magistrate may not have been concerned about storage protocol and hypothetical burglaries at the first bond hearing, but those were the primary concerns at the second.   The Magistrate decided that by allowing her sons to keep their inherited gun collection in her basement unlocked for three years, Ms. Bell engaged in "act of unreasonableness" that "disregard[ed] the safety of the neighborhood."   *Id.* at 26:13, 20-21.   The Magistrate concluded:   "I am completely unconvinced that there are any set of conditions that can assure the safety of the community, whether or not the guns are in the house or not.   Three years of a poor decision endangered a community."   *Id.* at 31:8-13.

---

[3] The Magistrate's statement that it is "a *very large problem* when *a mother* keeps a stash of 135 guns" raises concerns about potential bias that may not exist if Ms. Bell were a man.   *See United States v. Virginia*, 518 U.S. 515, 550 (1996) (criticizing "generalizations about 'the way women are'" and "estimates of what is appropriate for *most women*"); *cf. Tuan Anh Nguyen v. INS*, 533 U.S. 53, 90 (2001) ("The hallmark of a stereotypical sex-based classification under this Court's precedents is not whether the classification is insulting, but whether it relies upon the simplistic, outdated assumption that gender could be used as a proxy for other, more germane bases of classification.") (O'Connor, J., dissenting).

IV.   <u>Argument</u>

    A.   <u>The Magistrate's decision and reasoning were erroneous.</u>

The Magistrate erred in finding that no conditions of release would reasonably assure the safety of the community.   As an initial matter, it was wrong for the Magistrate to decide that because Ms. Bell's sons had not fulfilled her wish to dispose of the firearms that they had inherited from their father, Ms. Bell really "didn't want to get rid of them."   Ex. 2 at 26:4.   It is unclear how the Magistrate reached this conclusion that Ms. Bell secretly desired to keep the gun collection: the conclusion appears to be based on the assumption that if a parent keeps an adult child's property for a few years, the parent must want it.   As a matter of everyday experience, however, adult children routinely use their parents' homes— especially their basements—as storage units; parents often ask their children to stop using their homes as storage units; and children rarely make it a priority to satisfy that request.   More importantly, the Magistrate's assumption was robustly contradicted by actual *evidence*, namely the four sworn, detailed affidavits submitted prior to the hearing, and the screenshot of text messages between Ms. Bell and her son Luke weeks before her arrest.   ECF No. 9 at 5-16; ECF No. 11 at 3-6.   It was wrong of the Magistrate to prioritize a dubious assumption over sworn, detailed affidavits.   It was further error for the Magistrate not to take counsel up on the offer to see *more* evidence supporting the sworn affidavits.   Ex. 2 at 27:15-21.

15

It was also error for the Magistrate to say at the first bond hearing that it was not the Court's "concern" how the firearms were stored and what might have happened if a burglar broke into Ms. Bell's home, only to reverse course completely at the second bond hearing and decide that these would be the primary reasons for finding Ms. Bell to be an irredeemable danger.   *Compare* Ex. 1 at 20:24-21:4 *with* Ex. 2 at 24:3-8.   The "requirement of notice" is "[e]ngrained in our concept of due process," and is "essential so that [a] citizen has the chance to defend charges." *Lambert v. California*, 355 U.S. 225, 243 (1957).   The Magistrate not only failed to give notice that storage protocol was the Court's concern, but previously claimed that it was *not* the Court's concern.   The Magistrate's complete change in considerations without notice to the defense violated Ms. Bell's Fifth Amendment right to due process.

Most importantly, the Magistrate's decision that no conditions of release could reasonably assure the safety of the community because Ms. Bell did not lock away her children's inherited gun collection was substantively wrong.   For one thing, a locked safe could of course be stolen by the hypothetical burglars the Magistrate imagined, and then it still might very well be "terror on the streets." Ex. 2 at 24:7.   But more critically:   neither federal law nor the State of New Jersey *requires* firearms to be locked.   *See* Giffords Law Center to Prevent Gun Violence, "Safe Storage in New Jersey," https://giffords.org/lawcenter/state-laws/safe-storage-in-new-jersey/; *see also* Press Release by Sen. Robert Menendez, "Menendez, Booker,

16

Join Colleagues in Introducing Safe Gun Storage Act," Dec. 17, 2019,

https://www.menendez.senate.gov/newsroom/press/menendez-booker-join-

colleagues-in-introducing-safe-gun-storage-act (discussing the goal of proposed

legislation that has not been enacted).   Thus, Ms. Bell and her children did nothing

remotely illegal by keeping the inherited gun collection unlocked in her basement.

To the extent that the Magistrate Judge might prefer if the law required firearms to

be locked, that preference should not have informed the bond determination for Ms.

Bell at all.   *See Obergefell v. Hodges*, 576 U.S. 644, 687 (2015) ("It can be tempting

for judges to confuse our own preferences with the requirements of the law.")

(Roberts, C.J., dissenting); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983) (noting

that the wisdom of a statutory scheme "is not the concern of the courts"); *Nebbia v.

New York*, 291 U.S. 502, 537 (1934) ("Times without number we have said that the

legislature is primarily the judge of the necessity of [an] enactment . . . .").   Ms. Bell

cannot be faulted for doing exactly what state and federal law required her to do in

terms of locked storage.

But even assuming for the sake of argument that Ms. Bell and her children

did something wrong by failing to lock up the guns on their own volition, without

any law commanding it, the Magistrate Judge still erred.   Based on the finding

that Ms. Bell engaged in this purported "act of unreasonableness" and "disregard[]"

for the community's safety, the Magistrate determined that, even now, with all the

guns removed from the premises, no conditions could reasonably assure the safety

of the community if Ms. Bell were permitted to live at home while this case is pending.   Ex. 2 at 26:13-23.   That conclusion was wholly unreasonable and contravenes the Bail Reform Act.   *Every* defendant charged with a federal felony has engaged in at least one act that appears to have been "unreasonable[]" or to have "disregard[ed]" the safety of the community.   That does not compel the detention of a defendant while they are presumed innocent and their case is pending.   What compels detention is an indication that the accused would not *adhere to* necessary conditions imposed on them by the Court—for example, some indication that the accused has a history of violating court rules, or of incorrigible behavior on supervision, or that they are likely to continue their criminal behavior at home.   There is absolutely no such indication in this case.

In sum, the Magistrate Judge's bond determination was wrong for several independently sufficient reasons:   It prioritized a baseless assumption about Ms. Bell's desire to keep her children's gun collection over sworn, detailed affidavits that Ms. Bell asked them to get rid of it.   It unfairly relied on an issue—gun storage and what might happen after a hypothetical burglary—that the Magistrate Judge had previously said was not the Court's concern.   It suggested that Ms. Bell's status as "a mother" made leaving a large gun collection unlocked more problematic.   It characterized Ms. Bell as "unreasonable[]" for simply following state and federal requirements regarding gun storage.   And it improperly found that because Ms. Bell had not gone above what the law required, she would not adhere to conditions

18

of release imposed by the Court.   Because the Magistrate's decision regarding Ms.

Bell's danger to the community was so deeply flawed, it should not influence the

District Court's *de novo* bond determination at all.

B.     Ms. Bell is entitled to bond.

The defense submits that the four sworn affidavits submitted to the

Magistrate Judge, ECF No. 9 at 5-16; ECF No. 11 at 3-6, amply satisfy the burden

of production necessary to rebut the presumption of detention under § 3142(e).   *See*

*supra* Section II.A.   Thus, to keep Ms. Bell detained while she is presumed

innocent, the government must prove that no conditions of release can reasonably

assure her appearance in Court, by a preponderance of the evidence, or that no

conditions of release can reasonably assure the safety of the community, by clear

and convincing evidence.   *Id.*   In determining whether there are conditions of

release that will reasonably assure appearance and safety, the Court must consider

(1) the nature and circumstances of the offense charged, (2) the weight of the

evidence against the person, (3) the history and characteristics of the person, and

(4) the nature and seriousness of the danger to the community that would be posed

by the person's release.   *Id.*   The defense will address each of these factors in turn.

1.     Nature and Circumstances of the Offense Charged

The Court must consider "the nature and circumstances of the offense

charged, including whether the offense is a crime of violence, a [child sex trafficking

offense], a Federal crime of terrorism, or involves a minor victim or a controlled

substance, firearm, explosive, or destructive device."   § 3142(g)(1).   While concealing material support to an FTO is of course a serious charge, *see* § 3142(e)(3), the nature and circumstances of this offense are significantly less serious than in similar cases.   Thus, this factor weighs in favor of a finding that there are conditions of release which can reasonably assure appearance and safety.

As an initial matter, Ms. Bell's charge is not one of the offenses enumerated in § 3142(g)(1) as being especially serious.   It of course does not involve a minor victim, controlled substances, explosives, or a destructive device.   Nor does the charge involve a firearm.   The government may try to counter this argument by noting that, according to the Complaint, Ms. Bell allegedly gave Abdullah advice about what firearm he should buy.   ECF No. 1 at 14-20.   However, that advice was offered in March 2017, and thus is not part of the "the offense *charged*," § 3142(g)(1) (emphasis added), which only covers Ms. Bell's actions between February 2018 and November 2018.   Moreover, Ms. Bell's alleged advice was offered (1) over a year before HTS was designated an FTO by the U.S. Government, ECF No. 1 at 3; (2) in response to Abdullah's statement that he needed a gun for self-defense; (3) with Ms. Bell's express wish that "the weapon be only for self-defense," not for assisting HTS. Thus, the offense charged—concealing material support to HTS between February 2018 and November 2018—does not involve a firearm.

Nor is the instant charge a crime of violence.   A "crime of violence" is a felony that "has as an element the use, attempted use, or threatened use of physical

force against the person or property of another."   18 U.S.C. § 16(a) (defining "crime

of violence"); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018) (finding §

16(b) unconstitutionally vague).   One can readily be convicted of concealing

material support to a designated FTO without ever using, attempting to use, or

threatening to use physical force against the person or property of another.   Thus,

it is not a crime of violence.

Finally, the instant charge is not a "Federal crime of terrorism."   To be sure,

§ 2339C(c)(2)(A) can sometimes qualify as a "Federal crime of terrorism," but only if

the offense was "calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct."   §

2332b(g)(5)(A).   "[T]he material support statute requires only that the defendant

have knowledge of the foreign group's designation as a terrorist organization or the

group's commission of terrorist acts."   *United States v. Alhaggagi*, 978 F.3d 693,

701 (9th Cir. 2020).   "[W]here the conduct underlying [a § 2339B] conviction does

not involve violent terrorist acts, as is true *in many material support cases*, those

acts cannot, standing alone, support" a finding that the offense is a Federal crime of

terrorism.   *Id.* (emphasis added).   For example, if someone "open[s] a social media

account for" a known FTO, but there is no evidence that the defendant "knew the

accounts were to be used to intimidate or coerce government conduct," then the

offense is not a Federal crime of terrorism.   *Id.* at 702.   As another example, even

if a defendant agrees to help an FTO in its activities and knows "a good deal about

21

the organization that he [is] joining," those facts "are not sufficient to support a finding that" the defendant "had the specific intent to influence government conduct by intimidation or coercion, or to retaliate against the government" *United States v. Banol-Ramos*, 516 Fed. Appx. 43, 48-49 (2d Cir. 2013); *see also United States v. Stewart*, 590 F.3d 93, 136-38 (2d Cir. 2009) (upholding lower court's finding that defendant convicted of material support "did not act with the requisite state of mind" to support a designation of his offense as a "Federal crime of terrorism"). Here, there is no allegation, much less evidence, that Ms. Bell intended to influence, through intimidation or coercion, or to retaliate against the regime of Bashar Al-Assad by allegedly concealing the nature of support she provided between February 2018 and November 2018.   Thus, the instant charge is not a Federal crime of terrorism, or any other type of offense designated as particularly serious under § 3142(g)(1).

Moreover, "the nature and circumstances" of the allegations strongly support a finding that there are conditions of release which can reasonably assure appearance and safety.   In no particular order, these circumstances include the fact that:

1.  Ms. Bell is alleged to have provided material support to HTS over two years ago, and is not alleged to have broken the law at all since.

2.  Ms. Bell's alleged material support to HTS did not consist of conspiring with Abdullah to attack anyone, but of making a series of payments to him and telling him HTS should not speak to certain journalists.   ECF No. 1 at 11-12, 25.

3. It is hardly certain that supporting HTS was Ms. Bell's intention in sending payments to Abdullah.   For one thing, Abdullah appears to have "rejoin[ed]" HTS around August 2018—months after Ms. Bell began sending him money—which indicates that the money was not meant to support HTS but to support Abdullah himself.   Moreover, Ms. Bell has a history of sending money abroad to men whom she has felt close to.   Ex. 2 at 21:15-22:11.   Notably, at one point, Abdullah sent Ms. Bell a link to an Avril Lavigne song whose lyrics include:   "I'm not sure you know that the reason I love you is you being you, just you!"

4. Various acts that the prosecution characterizes as suspicious are only suspicious if one assumes Ms. Bell's guilt, which of course is not how the Constitution works.   *See Betterman*, 136 S. Ct. at 1614.   For example, there are countless innocuous explanations for Ms. Bell's use of "Encrypted Application 1"—also known as WhatsApp—to talk to Abdullah.   ECF No. 1 at 5.   To begin with, "[m]ore than two billion people worldwide use WhatsApp regularly to text or make phone calls." Shira Ovide, "Why WhatsApp Matters," N.Y. Times, Dec. 1, 2020, https://www.nytimes.com/2020/12/01/technology/why-whatsapp-matters.html.   In addition, counsel's guess is that probably a lot of dissidents in Syria use WhatsApp to avoid the surveillance of Bashar al-Assad's regime, which is best known for committing atrocities against the Syrian people and running secret torture prisons.   Russell Goldman, "Assad's History of Chemical Attacks, and Other Atrocities," N.Y. Times, Apr. 5, 2017, https://www.nytimes.com/2017/04/05/world/middleeast/syria-bashar-al-assad-atrocities-civilian-deaths-gas-attack.html; Anne Barnard, "Inside Syria's Secret Torture Prisons:   How Bashar al-Assad Crushed Dissent," N.Y. Times, May 11, 2019, https://www.nytimes.com/2019/05/11/world/middleeast/syria-torture-prisons.html.   This same reasoning may very well have animated Ms. Bell's decision to send Abdullah money through intermediaries.

5. The government will almost certainly cite, as evidence of Ms. Bell's chicanery, her statement in September 2018 that she did not want her Western Union account "watched more closely than it is already," as well as her complaint that "[e]ach time I withdraw money, it is noted because Western Union is trying to track fraud and terrorists for the government." ECF No. 1 at 26.   However, those statements are hardly as inculpatory as the government would like them to be.   First, they show that Ms. Bell already believed her account was being watched *somewhat* closely. Second, Ms. Bell's statement about companies "trying to track fraud and

23

terrorists" is probative of exactly nothing.   It is not an admission by Ms. Bell that she is *engaging* in fraud and terrorism, but merely an explanation of why Western Union monitors transactions.   Third, Ms. Bell's statements are totally consistent with her long-held belief in libertarianism, a political philosophy that is suspicious of nearly all government surveillance.   *See* Ex. 3 (photograph of Ms. Bell at a New Jersey Libertarian Party event); New Jersey Libertarian Party, "Bob Barr and U.S. Internet Surveillance," https://njlp.org/latest-news/35-candidates/240-bob-barr-and-us-internet-surveillance; *see also* Libertarianism.org, "A Libertarian Vision for Intelligence and Surveillance," https://www.libertarianism.org/essays/libertarian-vision-for-intelligence-surveillance ("Governments gather far too much information about us, and in dangerously intrusive ways.").

6. Ms. Bell has never, ever talked about harming the United States.   The discovery shows that Abdullah and Ms. Bell texted several times about Abdullah's affinity for President Trump and description of HTS as "Trump Soldiers."   At another point, Abdullah talked about harming the U.S.: he said that if America "hit the Syrian airports, we will return to revenge within New York."   Ms. Bell told him he was not thinking, saying: "Think dear . . .   All of us who help Syria will be in danger."

In sum, although the instant charge against Ms. Bell is a serious "presumption" offense under § 3142(e), it is not one of the enumerated offenses in § 3142(g)(1).   Moreover, the alleged offense ended more than two years ago; Ms. Bell is not alleged to have broken the law since; she is not alleged to have ever used or attempted to use violence; she appears to have been motivated more by infatuation than ideology; there are innocuous explanations for much of the allegedly suspicious conduct; and Ms. Bell has only ever spoken *against* harming the United States. Thus, § 3142(g)(1) favors a finding that there are conditions of release which can reasonably assure appearance and community safety.   That said, even if the Court finds this factor goes against Ms. Bell, the other factors favor release.

2.    The Weight of the Evidence

The Court must also consider the weight of the evidence against Ms. Bell.   §

3142(g)(2).   As stated earlier, to convict Ms. Bell of § 2339C(c)(2)(A), the

government must prove that she (1) knowingly provided material support to HTS;

(2) knowingly concealed the nature of the support; and (3) knew HTS was an FTO

or had engaged in terrorism.   *See supra* Section I.A.   The weight of the evidence

must be evaluated in reference to the charged offense.   If the evidence supporting

*any* element of an offense is weak, then there is a substantial likelihood of acquittal

and § 3142(g)(2) will favor the defendant's release.   Here, somewhat remarkably,

the evidence supporting *each* of the three elements is weak.

With regard to the first element, "[u]nder the plain language of § 2339B, . . .

the government must prove that the defendant 'knowingly provide[d] material

support or resources to a foreign terrorist *organization*,' rather than to individuals

who happen to be FTO members."   *United States v. Warsame*, 537 F. Supp. 2d

1005, 1022 (D. Minn. 2008); *accord United States v. Paracha*, 2006 WL 12768, at

*29-30 (S.D.N.Y. Jan. 3, 2006).   Section 2339B "does not prohibit being a member

of [an FTO] or vigorously promoting and supporting the political goals of the group";

it only prohibits "the act of giving material support."   *Humanitarian Law Project*,

561 U.S. at 39.   Communication with an FTO is only barred under the statute if it

"imparts a specific skill or communicates advice derived from specialized

knowledge."   *Id.* at 27.   As previously noted, it appears Abdullah "rejoin[ed]" HTS

25

around August 2018, six months after Ms. Bell is alleged to have begun sending him the payments that form the basis of the instant charge.   ECF No. 1 at 11.   Thus, the money Ms. Bell sent to Abdullah appears to have been wholly untethered to his membership in HTS, and not sent with any knowledge that it would support the group.   As for Ms. Bell's alleged verbal expressions of support for HTS and her advice to beware of American journalists, *see* ECF No. 1 at 11-13, those acts simply do not count as material support under § 2339B.   *See Humanitarian Law Project*, 561 U.S. at 27, 39.   Finally, even assuming Ms. Bell provided specialized knowledge to Abdullah back in March 2017 about which gun he should buy, that would not support the instant charge at all, for reasons already stated:   The advice was given:   (1) well before February 2018, which is when Ms. Bell is charged with providing material support, ECF No. 1 at 2; (2) over a year before HTS was designated an FTO, *id.* at 3; and (3) for the purpose of assisting Abdullah in "self-defense," not in any HTS activities.   For all these reasons, the evidence supporting the first element of the instant charge is weak.

Evidence supporting the second element, whether Ms. Bell knowingly concealed the nature of the support she allegedly gave to HTS, is also weak.   Even assuming there is reason to think that Ms. Bell's payments to Abdullah were intended to aid HTS, there is little reason to think that she meant to conceal those payments, particularly given that she is not alleged to have ever used a pseudonym or false information to send them.   Agent Hohmann's "belie[f]" to the contrary

appears to be based entirely on (1) the fact that Ms. Bell sent money to Abdullah through intermediaries; and (2) Ms. Bell's statements that she did not want her Western Union account "watched more closely than it already is," and that "[e]ach time I withdraw money, it is noted because Western Union is trying to track fraud and terrorists for the government."   ECF No. 1 at 26.   As explained in the previous section, however, there are any number of completely innocuous explanations for Ms. Bell sending Abdullah money through intermediaries:   perhaps it was difficult for Abdullah to travel to certain Western Union outposts, or perhaps he was worried, as a Syrian dissident, about his activities being monitored by the regime of Bashar al-Assad.   Same goes for Ms. Bell's statements about not wanting her Western Union account watched "more closely than it already is," as explained in the previous section.   At trial, it will not be Ms. Bell's burden to show that an innocuous explanation is correct; it will be the *government's* burden to prove beyond a reasonable doubt that innocuous alternative explanations are incorrect.   It is doubtful the government will be able to do so, and with good reason:   because Ms. Bell is innocent.

Finally, the government has made no credible allegation and provided zero evidence in discovery that Ms. Bell knew HTS was designated an FTO at the end of May 2018, or that it was otherwise engaged in terrorism.   There is not much else for counsel to say on this point.   Ms. Bell has followed the law her entire life, has always described herself as "patriotic," and once told a friend that she wished people

27

were less "into partying on Memorial Day [than into] giving . . . solemnity to our

Armed Forces."   ECF No. 9 at 2 (describing a personal email counsel has seen).

Absent evidence to the contrary, there is no reason to think Ms. Bell would ever

knowingly provide material support to an organization that the U.S. Government

had designated an FTO.   Counsel has actually tried to obtain evidence to the

contrary, but to no avail:   On December 22, 2020, counsel sent a short letter to the

prosecutor in this case specifically requesting evidence that Ms. Bell knew HTS was

an FTO.   The prosecutor has not responded.

        In sum, by all appearances the government has extraordinarily little evidence

that (1) Ms. Bell's payments to and communications with Abdullah between

February 2018 and November 2018 constituted knowing material support to HTS;

(2) Ms. Bell knowingly concealed her payments and advice to Abdullah from the

U.S. Government; and (3) Ms. Bell knew HTS was designated an FTO on or about

May 30, 2018, or that the group was engaged in terrorism.   Thus, § 3142(g)(2)

weighs strongly in favor of Ms. Bell's release.

### 3.   History and Characteristics

        The Court must consider "the history and characteristics of the person,

including (A) the person's character, physical and mental condition, family ties,

employment, financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse, criminal history, and

record concerning appearance at court proceedings; and (B) whether, at the time of

the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law."   § 3142(g)(3).   Each and every one of these factors weighs in favor of Ms. Bell's release on minimal conditions.

Ms. Bell has outstanding character.   As the affidavits submitted to the Magistrate show, she is a devoted mother and grandmother who would do anything for her sons and grandchild.   *See generally* ECF No. 9 at 5-16; ECF No. 11 at 3-6. She mentors students at a local college.   ECF No. 9 at 15.   She had a troubled marriage to Richard Magera and they got divorced, but when he was diagnosed with terminal brain cancer in 2012, she took care of him until his death.   ECF No. 9 at 6.   She has no history of drinking or drug abuse.   She has zero criminal record.   She of course has no record of not appearing at court proceedings, since she has never had a court proceeding.   And she of course was not on probation or parole when she was arrested in this case.

Ms. Bell has lived in northern New Jersey for decades, and in her home in Hopatcong for about seven years.   Near the beginning of November, she was celebrating, on Facebook, nine years of working at Morristown Medical Center as a clinical research coordinator.   ECF No. 9 at 2.   Now that job is gone.   *Id.* However, she can hardly be faulted that, due to a specious terrorism charge, she has no job to go back to.   Ms. Bell has always done the absolute best she can to be a good partner, mother, grandmother, employee, and mentor.   Far more worrisome

29

people than Ms. Bell routinely get bond under the BRA.  *See United States v. Tobin*, Case No. 1:19-mj-5644, ECF No. 30 (D.N.J. Apr. 15, 2020) (setting conditions of release for a defendant who allegedly admitted to launching "Operation Kristallnacht" and told fellow white supremacists to vandalize synagogues).

The U.S. Pretrial Services report for Ms. Bell lists "possible mental health history" as a factor suggesting a risk of nonappearance and danger to the community.   This assessment unfairly stigmatizes Ms. Bell for simply admitting that she has received counseling in the past.   Ms. Bell's need for counseling and a stable environment is actually a reason to think she will be only more scrupulous about adhering to conditions of release, for fear of ending up back at the Essex County Correctional Facility ("ECCF").   Ms. Bell suffers from severe anxiety that stems from a troubled childhood.   She was an only child, her parents separated when she was a toddler, and her father then moved to Texas.   Maria lived with her mother for most of her adolescence in Somerset, Kentucky.   When Maria was in high school, her mother was diagnosed with malignant melanoma.   She took care of her mother alone as a teenager, the same selfless act she would later take for her ex-husband Richard Magera.  *See* ECF No. 9 at 6.   Around September 1984, Maria's mother died.   She was 17 years old.   She went to live with family friends from St. Patrick's Episcopal Church, John and Sheryl Polk, while everyone figured out where she could go permanently.   John and Sheryl managed to find her father in Texas.   He drove to Somerset and brought Maria home with him.   But he had a

new wife and other children, and Maria's stepmother did not like her.   Maria was spiraling as a 17 year old from the grief of watching her mother die, and living in a new place with no friends and a father she barely knew.   A few weeks later, he drove Maria back to Kentucky to live with a friend's family, and Maria never saw her father again.   When she was 18, Maria joined the military as a way to support herself.   *See* ECF No. 1 at 5 n.5.   She was stationed at Fort Dix in New Jersey, before being discharged shortly thereafter.   *See id.*   She has lived in New Jersey ever since.   With the help of friends and counseling, she has managed to overcome her severe anxiety and make a good life for herself and her family.

Ms. Bell has informed counsel that she has made numerous requests for counseling at ECCF, but has not received any since she first entered. Incarceration is stressful for anyone, but particularly for her, who at 53 years old has never been in jail before and who fears, because of her age and certain health issues, that she is at significantly higher risk of severe illness if she contracts COVID-19.   (As of January 4, 2021, there are 66 inmates and detainees in ECCF's special COVID-19 quarantine units.)   Ms. Bell has informed counsel that she was recently threatened by two inmates who were smoking (illegally, of course) near her cell whom she asked to move elsewhere because the smoke was bothering her.   Ms. Bell has asked counsel to inform the Court that she would be willing to consent to even home incarceration if necessary, simply to avoid having to remain at the ECCF while this case is pending.   However, counsel submits that Ms. Bell's conditions of

31

release should be far more lenient under § 3142(c).   *See, e.g.*, ECF No. 9 at 3-4 (discussing cases in which defendants allegedly made violent threats to kill Americans but were released on lenient conditions—only to eventually be acquitted by impartial juries).

For the foregoing reasons, § 3142(g)(3) weighs strongly in favor of Ms. Bell's release.

4.   <u>The Nature and Seriousness of any Danger Posed</u>

The Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."   § 3142(g)(4).   Ms. Bell would not pose a danger to anyone on pretrial release, for the simple reason that she has never posed a danger to anyone in her life.   Thus, this factor weighs heavily in favor of release on minimal conditions.

V.   <u>Conclusion</u>

Each day Maria Sue Bell spends incarcerated makes a mockery of the presumption of innocence, of the Bail Reform Act, and of the most basic notions of fairness under the Constitution.   She should be released immediately, on the least restrictive conditions necessary to reasonably assure her appearance in Court and the safety of the community.   § 3142(c).

Respectfully submitted,

MARIA SUE BELL
By Counsel

_____ /s/ _____
Rahul Sharma, AFPD
Office of the Federal Public Defender
1002 Broad Street
Newark, NJ 07302
(973) 320-7350
Rahul_Sharma@fd.org

33

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


UNITED STATES OF AMERICA,      .
                               .
                               .
                               . Case No. 20-mj-09451
VS.                            .
                               . Newark, New Jersey
MARIA BELL,                    . November 25, 2020
                               .
          Defendant.           .
                               .


TRANSCRIPT OF INITIAL APPEARANCE AND BAIL HEARING
BEFORE THE HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:      DEAN SOVOLOS, ESQ.,
                         United States Attorney's Office
                         Room 700
                         970 Broad Street
                         Newark, NJ 07102
                         (973) 645-2700

For the Defendant:     RAHUL SHARMA, ESQ.
                       Office of the Federal Public
                       Defender
                       1002 Broad Street
                       Newark, NJ 07302
                       (973) 645-6347


Audio Operator:


Transcription Company:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Dr.
                          Suite 203
                          Riverdale, N.J. 07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

I N D E X

| PROCEEDING | PAGE |
|---|---|
| Proceedings | 3 |
| Bail Argument | |
| By Mr. Sovolus | 5,16 |
| By Mr. Sharma | 11,19 |
| Bail Decision | |
| By The Court | 20 |

Initial Appearance and Bail Hearing
20-mj-09451

3

1               (Commencement of proceedings)

2

3               THE COURT:  We're on the record in United

4    States v. Bell, 20-mj-9451 is the docket number.  And

5    Ms. Bell you have the right to remain silent, anything

6    you say will be used against you, and you have the

7    right to a lawyer.  I'm considering appointing Mr.

8    Sharma as your attorney because you do qualify.  Have

9    you spoken to Mr. Sharma?

10              THE DEFENDANT:  Yes, I have.

11              THE COURT:  Okay, very well.  So, Mr. Sharma

12   thank you for taking this appointment.

13              MR. SHARMA:  My pleasure Your Honor.

14              THE COURT:  Let's have the appearance of the

15   United States Attorney.

16              MR. SOVOLOS:  Good afternoon Your Honor

17   Assistant United States Attorney Dean Sovolos from the

18   Government.

19              THE COURT:  And formally Mr. Sharma.

20              MR. SHARMA:  Good afternoon Your Honor Rahul

21   Sharma on behalf of Ms. Bell.

22              THE COURT:  All right.  Can we let Ms. Bell

 1  know what she is charged with and what the potential

 2  consequences could be.

 3          MR. SOVOLOS:  Yes, Your Honor, thank you.  Ms.

 4  Bell is charged in a one count complaint with

 5  concealment of terrorist financing to a designated

 6  foreign terrorist organization in violation of 18

 7  United States Code 2339C-C2(A).

 8          Judge the penalties are a maximum penalty of

 9  ten years imprisonment, a maximum fine, if convicted of

10  $250,000 and also a term of supervised release could be

11  included in that term of imprisonment for a maximum

12  term of three years.

13          Judge, I should mention I -- I do think that

14  Ms. Bell is a United States Citizen.  But were she not

15  a citizen we would advise her that a conviction of the

16  charged offense would likely result in being subject to

17  immigration proceedings and removal from the U.S.  And

18  as a citizen of a different country she would have the

19  ability to contact the consulate in her home country

20  regarding this charge.

21          THE COURT:  All right, thank you.  Ms. Bell do

22  you understand what you're charged with and what the

23  potential penalties could be?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  Mr. Sharma what about a

1  preliminary hearing?

2          MR. SHARMA:  Ms. Bell waives preliminary

3  hearing Your Honor.

4          THE COURT:  Okay, so it's time that we discuss

5  bail.  Is the government moving for detention?

6          MR. SOVOLOS:  Yes, Your Honor, the Government

7  is seeking detention.

8          THE COURT:  All right, can you let me know

9  why?

10          MR. SOVOLOS:  So, this is a -- an increasingly

11  long list of reasons Judge, to be honest.  We don't

12  believe that there -- there is any combination of

13  factors or conditions that can assure the -- both the

14  appearance of the defendant and also the safety of the

15  community.

16          First, we're concerned that the government --

17  the government's concerned that the defendant poses a

18  flight risk.  She is facing a maximum penalty of ten

19  years as we mentioned.  She has a history of travel as,

20  I think, we're all aware of.  And she also has a long

21  history of stated desire to leave the United States,

22  which the Government is aware of based on the evidence

23  as outlined in the complaint, but also outside of the

24  complaint.

25          We would remind the Court that on November 23,

1  2018 the government stopped Ms. Bell when she was

2  trying to leave a New York City airport to go to

3  Turkey.  In 2017 as indicated in the report that we've

4  all reviewed, Ms. Bell did go to Turkey, and we believe

5  she went to Turkey to meet with the individual

6  referenced as User One, who is a foreign terrorist

7  organization fighter and member.  And the context of

8  the communications that she's had shed light on her

9  desire to leave this country Judge.

10         We have several communications that I'd like

11  to draw the Court's attention to.  One is from October

12  -- strike that Judge.  August 5th of 2018, where she's

13  communicating with User One, and she says, "The anxiety

14  of being in America makes me ill easily.  I rarely tell

15  you and I try to be happy; it is hard to be away from

16  Turkey."  The User One member of foreign terrorist

17  organization responds, "Don't worry my dear I'm

18  studying the situation, we will live together in

19  Turkey, we will settle together."

20         Ms. Bell is also having a communication in

21  November 13, 2018 prior to her attempted travel from --

22  on November 23, 2018 to Turkey, where she says, "I've

23  completed my plans to travel to Istanbul on the 24th.

24  I feel more peaceful, patient and optimistic when I am

25  in Turkey.  I feel isolated and anxious in America."

1  She also states, "My question is did I commit a sin

2  against God by not coming to Syria?  I feel like I did

3  and I want to go with all my heart."

4          THE COURT:  Could you repeat that, "Did I

5  commit a sin," -- slow down.

6          MR. SOVOLOS:  "Against God by not coming to

7  Syria."  And this is another individual not referenced

8  as User One in the complaints, where she's asking that

9  person for guidance on whether or not she committed a

10  sin in her mind against God by not coming to Syria.

11          So, we -- we draw your attention to this Judge

12  because this is another communication where the

13  defendant have expressed the willingness and the desire

14  to leave the United States.

15          On October 8th of 2018, again a little over

16  a month before her intended travel out of the New

17  York City Airport we referenced, the defendant stated,

18  "I cried a little bit it, but it is good as it helps

19  me lower my expenses and be one step closer to

20  Turkey."

21          Judge on November 20, 2018, again days before

22  her intended travel, she states, "Life in America's

23  expensive and my money spends themselves too quickly.

24  I must replenish our savings and stay motivated for

25  purchasing a home in Turkey."

 1            And finally Judge on March 31, 2017 the

 2    defendant states, "If I could cross the border and

 3    work besides you and would, so I fight for you the

 4    only way I can."  And this is a communication with

 5    another user, not User One.  And she states, "I am

 6    applying for jobs in Turkey and -- to have access to

 7    the border."

 8            So Judge, of course we don't bring this to

 9    your attention because there's anything illegal about

10    that in and of itself, but I think that it shows a

11    demonstrated and longstanding desire and willingness to

12    leave the United States.  And therefore we believe that

13    that heightens her risk of -- of flight.

14            Judge, with regards to the --

15            THE COURT:  Those communications were all in

16    2018?

17            MR. SOVOLOS:  There was one in 2017 and then

18    the remainder of the communications I just outlined

19    were in 2018 and they lead up to her travel or

20    attempted travel out of the New York City Airport on

21    November 23, 2018.

22            THE COURT:  Okay.

23            MR. SOVOLOS:  Judge if you don't -- if you

24    have any -- if you don't have any questions on that,

25    I'd like to move on to the concern by the Government

1   that the defendant is a danger to the community.

2            THE COURT:  Yes.

3            MR. SOVOLOS:  So, the first thing I'll say is

4   something that's obvious.  In the complaint she's shown

5   a committed sustained sophisticated and comprehensive

6   way of supporting a terrorist organization.  But beyond

7   that I want to draw your attention to the preliminary

8   inventory that the FBI has reported that was recovered

9   today from her residence, that includes:

10           An estimated 136 pistols or rifles that are

11  deemed to be operable, of course those are subject to

12  operability tests, but they seem to be operable;

13           15 canisters of ammunition;

14           Black powder; and,

15           One light anti-tank weapon, which is referred

16  to as LAW that the bomb techs for the FBI are presently

17  evaluating to ascertain whether or not that's inert.

18  And I've been told that the nomenclature is an M72-82

19  portable anti-tank rocket.

20           Now, Judge, I present that to the Court after

21  we've reviewed in the complaints, particularly in

22  paragraph 28 where Ms. Bell is providing advice

23  regarding firearms, ammunition, the caliber of weapons,

24  the preferred types of weapons, the cost of weapons,

25  generally displaying and demonstrating a great degree

1   of knowledge on these weapons, and that's not

2   surprising given her background as active duty in the

3   United States Army and also her background in the Army

4   National Guard.

5          Take that with some of the statements that

6   she's made Judge, where she said, for instance, "I live

7   very close to New York and I'm connected on a social

8   media platform," that we redacted, "to many

9   revolutionaries."

10         The bottom line Judge is taking all of this

11  together you find someone who's highly sophisticated,

12  highly motivated, highly invested, who wants to leave

13  the United States, wants to help a foreign terrorist

14  organization and has the ability and willingness to do

15  it.  So, as such Judge the Government's position is

16  that the defendant should be detained.

17         THE COURT:  Can you tell me the location --

18  this is a one family home, the address that I'm aware

19  of?

20         MR. SOVOLOS:  That's correct Judge, it's a one

21  --

22         THE COURT:  And can you --

23         MR. SOVOLOS:  -- home, I believe it's two

24  bedrooms.

25         THE COURT:  Oh, okay.  And can you tell me the

1  location of the weapons that were found?

2        MR. SOVOLOS:  Sure Judge.  I can get

3  additional clarification on that.  But I do know that

4  some of those weapons were recovered in an open safe in

5  the residence.  I don't know the location of the -- of

6  the LAW, the light anti-tank weapon, because that was

7  information that I just received shortly before we had

8  our initial appearance.  Nor do I know the location of

9  the canister, the ammo or the black powder.

10        THE COURT:  Okay.

11        MR. SOVOLOS:  And Judge, I do also want to

12  note for the record that these were described as older

13  weapons, so you know the -- they -- they could be

14  antique weapons, but I don't know that they would

15  constitute antique weapons -- weapons for the purposes

16  of -- of the law.  But in any case, they are operable,

17  and given the background and the circumstances of this

18  defendant we find it to be highly troubling that this

19  defendant had access to these weapons and corresponding

20  ammo in that -- in that quantity.

21        THE COURT:  Okay, Mr. Sharma.

22        MR. SHARMA:  Okay Your Honor.  In addition the

23  points that I raised in my letter, which I stand by, I

24  would -- I left a couple of things out of the letter

25  and I'd just like respond to a couple of things that

1  Mr. Sovolos says.

2        First of all, one thing I left out of the

3  letter is that either Mr. El Mageli (phonetic) who's

4  name I accidentally misspelled El Nageli (phonetic) in

5  the letter, either he or Mr. Magera (phonetic) whoever

6  Ms. Bell lives with is willing to serve as a

7  third-party custodian and to notify the Court if

8  there's any -- if she breaks the Court's rules in any

9  way.

10        Another thing I want to point out is, as Your

11  Honor notes there is no communications in 2019 or 2020.

12  We're approaching the end of 2020, I am not hearing

13  about anything in the last two years, any

14  communications indicating a desire to leave the United

15  States and live elsewhere.  And in fact there was a

16  return ticket on this -- for her trip that she was

17  going to go to Cairo as the flight itinerary shows.

18        Ms. Bell in my conversations with her, her

19  primary concern, at least when I started speaking to

20  her, was that she was arrested before she was able to

21  enter into her work database, that she needed to take

22  vacation time, and she is asking me to contact her job

23  and -- and do that.  She -- she was clearly intending

24  to return to the country.  The itinerary shows that.

25  Her putting in for vacation time with her work shows

1  that.

2        I think that the fact that these antique

3  weapons were there.  Her husband, as I understand it,

4  worked at an armory and had some sort of connection to

5  the park service or the Department of Defense.  He died

6  years ago.  He was into collecting this stuff.

7        That's not to say that there aren't some

8  legitimate concerns about -- about this, and those

9  weapons have all been taken out of the home and we're

10 not suggesting that they be put back in.  But it is a

11 little -- it is, in my opinion, a little strained to

12 say the least to note Ms. Bell's activity in the army

13 as a reason for being very concerned that she was, you

14 know, somehow some expert on these things.

15       My reading of the pre -- pre-trial services

16 report is that she was an active member of the National

17 Guard and attended training in 1985 at Fort Dix and was

18 processed out administratively after eight weeks.  So,

19 I don't really think that she's -- that we're talking

20 about a -- you know, deadly sharp shooter here.

21       As for the safes, there were -- there were two

22 safes, one of which was broken, and had these antique

23 firearms in them.  And the other safe, my

24 understanding is Mr. Magera needed to provide the key

25 to the government in order to open that safe with

1  firearms, because Mr. Magera kept the key at his house.

2  Ms. Bell did not have the key in her own house.  So,

3  she was not even accessing those weapons as I

4  understand it.

5          In any event, the Court has a range of

6  options here that I think will -- that I think will

7  absolutely assure Ms. Bell who -- Ms. Bell's appearance

8  and the fact that she doesn't pose a danger to the

9  community.

10          I will say about her posing a danger to the

11  community, from my reading of the complaint it appear

12  -- I imagined this complaint took a while to -- took a

13  while to investigate and file.  And I can't imagine if

14  the Government really thought Ms. Bell was a serious

15  threat to the community that they would have -- that

16  they would not have acted sooner in this investigation

17  to arrest her and then filled out the complaint at a

18  later time.

19          But in any event, the Court has a range of

20  options.  It can -- it can -- it can have a bond

21  co-signer, it can have a third party custodian, it can

22  prohibit Ms. Bell from any use of a cell phone or

23  computer when not at work.  There are all these options

24  available.

25          Ms. Bell is -- she is at a -- likely at an

1  increased risk due to her age and due to her body mass

2  index of severe illness if she gets COVID.  In the last

3  week or so twice of many people are in quarantine at

4  the Essex County Correctional Facility.  We all know

5  what's happening at lines at Urgent Care Centers around

6  -- around the area.  And I think that there's no real

7  -- I -- I absolutely believe that there are conditions.

8  Specifically home detention with employment, or even --

9  or even no home detention.

10         But I -- I think Ms. Bell is absolute -- poses

11 minimal risk of non-appearance and danger to the

12 community given that the -- this offense allegedly

13 happened in 2018, that there's no recent communication

14 expressing a desire to leave, that she had a return

15 flight from Cairo where she was going to visit her

16 husband's family.  That her son and partner, Mr. El

17 Mageli are willing to answer any of the Court's

18 questions.  That they both -- Mr. El Mageli is an -- is

19 an examiner for the Department of Financial Services.

20 I imagine he had to go through some clearance in order

21 to get that position.  Mr. Magera is a biomedical

22 engineer.  She can live at either one of these

23 residences.

24         I asked for her to be allowed to live back at

25 her regular residence, without her passport, without

1 | the -- without the firearms.  And I think that that

2 | will absolutely insure her appearance and no danger to

3 | the community.

4 |        THE COURT:  You keep saying that they're

5 | antique firearms, what does that mean?

6 |        MR. SHARMA:  I mean, my understanding -- I

7 | have very limited information here, right, because I

8 | don't have the same information that the Government

9 | does.  But my understanding is that these are firearms

10 | that she inherited from her ex -- from her deceased

11 | husband who, my understanding has collected mostly

12 | antique firearms, and they were -- some were kept in a

13 | safe -- they were both kept in safes one of the -- one

14 | of which -- and my understanding is that they might

15 | have been in the basement of the home.  My

16 | understanding is that at least was one of them is a

17 | safe that was locked and that she did not even have a

18 | key to.  That Mr. Magera was --

19 |        THE COURT:  I know you said that.  I just

20 | think as antique as not necessarily operable but in a

21 | -- in a glass case for show.  That's why I'm asking.  I

22 | mean were they -- do we know Mr. Sovolos, just out of

23 | curiosity anything more?  I know it's early.

24 |        MR. SOVOLOS:  So, Judge, I'm going to -- I --

25 | you know, I -- I hear what Mr. Sharma's saying.  But

1   one thing I want to remind the Court is, we're not

2   talking about one or two or five possible antiques.

3   Which from my preliminary descriptions that have come

4   in, coming to 18-U.S.C.-921 it doesn't sound like they

5   would be likely to constitute what an antique weapon is

6   from a legal sense.

7         THE COURT:  Okay.

8         MR. SOVOLOS:  But putting that issue aside

9   Judge, you have 136 pistols or rifles with

10   corresponding ammunition that are deemed to be

11   operable.  And even in the hands of someone who is, you

12   know, not -- you know Mr. Sharma is correct that her

13   history in the United States Military goes back a

14   while.  But her history of providing guidance and

15   advice and insights on nomenclature and the details of

16   weapons and the best way to utilize these weapons isn't

17   that long ago, and couple that --

18         THE COURT:  Who -- who would be communicating

19   with about that?  I mean you don't have to say a name,

20   but do you know a position, to the best of your ability

21   to disclose, within the conformance of the complaint

22   for the record.

23         MR. SOVOLOS:  Also Judge, there's extensive

24   communications with User One, who we described as the

25   HTS fighter, and was a member of the foreign terrorist

1   organization, and there was also extensive

2   communication with other individuals who are, based on

3   the context of the conversations, assessed to be

4   members of that foreign terrorist organization where

5   she is giving advice and guidance on very detailed

6   matters of preferable firearms, you know, superior fire

7   power, nomenclature.  You know, something that shows

8   knowledge that probably exceed most people's knowledge.

9   And I don't know if that knowledge was derived at from

10  her military training or elsewhere.  But it's clear

11  that she has a knowledge that exceeds that of the

12  average person.

13          And you take -- we have that going into a

14  search that occurred this morning and then we come up

15  with 136 guns.  And Judge, again, an M72-82 anti-tank

16  rocket.  Now, again that may be inert, I don't know,

17  but I am presenting the information that I received

18  from the FBI.  And given the circumstances and the

19  charges here, I think that these need to be taken

20  seriously.  And again, Judge, it's not just that there

21  was antiques -- what is alleged to be antique weapons,

22  there's 136 weapons deemed to be operable with

23  ammunition.  And not just a little bit of ammunition.

24  15 canisters of ammunition.

25          So, you have guns, you have weapons and you

1  have an abundance of ammo in the hands of someone who's

2  been charged with providing material support and

3  concealing that support to a foreign terrorist

4  organization.

5          THE COURT:  Mr. Sharma anything else?

6          MR. SHARMA:  Yeah, Your Honor.  I'm looking at

7  -- I'm looking at the complaint and I'm looking at this

8  supposedly specialized knowledge that she's given about

9  -- about guns, and I'm -- I'm not -- I'm not seeing

10 anything that I think is -- she's charged with a crime.

11 It's a concerning crime.  I'm not going to -- I'm not

12 going to pretend that it's not.  But I am not seeing

13 anything here that is so specialized or indicates that

14 she's handling guns on a regular basis at all.

15          I'm seeing --

16          THE COURT:  Well what -- communication then,

17 it's -- it's about the weaponry though.

18          MR. SHARMA:  I'm sorry.

19          THE COURT:  It's -- it's about the weaponry,

20 the conversations?

21          MR. SHARMA:  Yes, but she said -- but she even

22 says things like -- in one -- in one text exchange --

23 and once again these are all from 2018.  Since 2018 --

24 in 2019 and 2020 there's no allegation of her doing any

25 of this.  But in 2018 she said -- she even said, "when

1   guns become involved," -- "I'm happy" -- she implies

2   that she's happy when the west fights with words and

3   money, "but when guns become involved it gets ugly and

4   bloody very fast."  This is not telling me that Ms.

5   Bell is -- is seeking some -- some armed Jihad at --

6   you know at a moment's notice at all.

7          In fact elsewhere in the complaint when she

8   talks about guns she says, well I can't -- I can't

9   really -- she -- someone -- someone talks to her, User

10  One talks to her about -- about buying a gun and she

11  says, guns are -- "Guns are very expensive and remember

12  my limits on money.  Half must be saved for a new

13  house."

14         I mean I -- I don't really -- I -- I think

15  that this is all actually a strong indication.  And Mr.

16  Magera can back this up.  So we have a witness here who

17  is willing to -- to corroborate that these guns were

18  possessed by his deceased father and -- and that they

19  were bequeathed to him and his brother Kyle and they

20  decided let's just leave this here because we don't

21  have any -- we don't have where to store this.

22         THE COURT:  Okay, I -- I accept that.  I

23  accept that.  I accept that the -- that the weaponry

24  was left to the family.  It's a little worrisome to me

25  that somebody would leave in their house for a couple

1  of years all of this weaponry and some of it sounds

2  pretty serious and not do anything about it.  I mean if

3  -- if -- if the house was burglared the weapons could

4  be out on the streets, but that's not my concern.

5          My concern is that there's a house full of

6  almost 150 weapons that have all been found to be

7  operable.  And I have to agree that if you take the

8  component parts of this, the 2018 I'd rather live in

9  Turkey.  Okay, so she's rather live in Turkey.  Maybe

10  other people would too.  And -- and the guns that were

11  left by the father.

12          If you separate that those are individualized

13  components.  But what -- what is troublesome to me is

14  the remarks stated in the complaint that seem to be

15  advisory with respect to the use of weapons, and that's

16  troublesome to me.  I don't know that I would be able

17  to say that Ms. Bell's a flight risk, but I think at

18  this point, without more information that she is a

19  danger to the community, tying together all of these

20  different components.

21          So, what I guess I'm saying is I'm going to

22  detain her at this point, but the government and

23  yourself will develop likely more information in the

24  coming days and I'm willing then to reconsider any new

25  information.

1          But I think it's in the interest of the

2    community at this point to detain Ms. Bell.  And this

3    was not an easy decision.  So, that's what I'm going to

4    do.  I want to read that pursuant to 5F of the Federal

5    Rules of Criminal Procedure as set forth -- Mr. Sharma

6    does your client agree to appear here voluntarily by --

7    by video?

8          MR. SHARMA:  She does Your Honor.

9          THE COURT:  Okay, thank you, I forgot that.

10   And I'll read the Brady Order that pursuant to 5F of

11   Federal Rules of Criminal Procedure as set forth on the

12   record during the initial appearance of Ms. Bell today

13   on the 25th of November, 2020 in the presence of the

14   Prosecutor and defense, Court confirms that the United

15   States has a continuing obligation to produce all

16   exculpatory evidence to the defendant pursuant to Brady

17   v. Maryland and its progeny and orders it to do so.

18   Failing to do so in a timely manner may result in

19   consequences including but not limited to the Court's;

20   order to produce information, the granting of a

21   continuance, the exclusion of evidence, adverse jury

22   instruction, dismissal of charges or contempt or

23   sanctions.

24          So, I mean this is applicable in this case in

25   my eyes Mr. Sovolos very -- very importantly.  So as

1    information develops, I ask that the Court be apprised

2    of that information, kept up to date and I want to keep

3    this case for future consideration of bail application,

4    Mr. Sharma.

5             MR. SHARMA:  Thank Your Honor.

6             THE COURT:  Thank you all.

7             MR. SOVOLOS:  Thank you Your Honor.

8

9                  (Conclusion of proceedings)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          Certification

7

8      I, JESSICA ROBINSON, Transcriptionist, do hereby

9  certify that the pages contained herein constitute a

10 full, true, and accurate transcript from the official

11 electronic recording of the proceedings had in the

12 above-entitled matter; that research was performed on

13 the spelling of proper names and utilizing the

14 information provided, but that in many cases the

15 spellings were educated guesses; that the transcript

16 was prepared by me or under my direction and was done

17 to the best of my skill and ability.

18     I further certify that I am in no way related to

19 any of the parties hereto nor am I in any way

20 interested in the outcome hereof.

21
22 /s/ JessicaRobinson                    12/31/20
23 Signature of Approved Transcriber          Date
24 Jessica Robinson, AOC #581
25
26 King Transcription Services
27 3 South Corporate Dr.
28 Suite 203
29 Riverdale, N.J. 07457
30 (973) 237-6080

1
2
3
4
5
6
7
8
9

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


UNITED STATES OF AMERICA,          .
                                   .
                                   .
                                   . Case No. 20-mj-09451
VS.                                .
                                   . Newark, New Jersey
MARIA BELL,                        . December 21, 2020
                                   .
            Defendant.             .
                                   .


TRANSCRIPT OF BAIL HEARING
BEFORE THE HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:
For the Government:      DEAN SOVOLOS, ESQ.,
                         United States Attorney's Office
                         Room 700
                         970 Broad Street
                         Newark, NJ 07102
                         (973) 645-2700

For the Defendant:       RAHUL SHARMA, ESQ.
                         Office of the Federal Public
                         Defender
                         1002 Broad Street
                         Newark, NJ 07302
                         (973) 645-6347

Audio Operator:


Transcription Company:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Dr.
                         Suite 203
                         Riverdale, N.J. 07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>I N D E X</u>

<u>PROCEEDING</u>                                    <u>PAGE</u>

Argument
 By Mr. Sharma                              4,16,17
 By Mr. Sovolos                              5,16

Decision
 By The Court                                 31

1                (Commencement of proceedings)

2

3                THE COURT:  We're now on the record in

4   20-mj-9451, United States v. Maria Bell.  This is a

5   motion for bond that was filed by the defense.

6   Submissions include documents from both the defense and

7   the Government including affidavit that I just read of

8   Ms. Bell's son.  There are plenty of arguments in all

9   the submissions.  I just want to get back on the

10  docket.

11               The Government, I think, submitted photos that

12  I could not download, just so you know.  So, I have on

13  the docket; motion for bond, letter from defense

14  counsel and another letter for defense counsel in

15  support of motion for bond.  That's Docket 9, 10, 11.

16               I just want to make sure I haven't missed

17  anything from Mr. Sovolos or Mr. Sharma.  Mr. --

18               MR. SHARMA:  No, nothing from me Your Honor.

19               THE COURT:  Okay, Mr. Sovolos was there any

20  other submission that I missed.  I did get the email

21  2017.

22               MR. SOVOLOS:  Uh huh.

23               THE COURT:  I have that, and I've reviewed

24  that.  I think that might have done -- that's it

25  though, right, including –

 1           MR. SOVOLOS:  Your Honor, so we submitted a

 2   chat from 2017.

 3           THE COURT:  Right.

 4           MR. SOVOLOS:  Related to travel.  And then

 5   also some photos to follow up on the Court's request to

 6   provide context on how these --

 7           THE COURT:  Yes.

 8           MR. SOVOLOS:  -- how these weapons were

 9   stored.

10           THE COURT:  Yes okay.  So, all right your

11   motion Mr. Sharma.

12           MR. SHARMA:  Yes, Your Honor.  Well, as we say

13   in our motion I -- we respectfully believe that Ms.

14   Bell is easily overcome the rebuttable presumption that

15   no combination of conditions will reasonably assure her

16   appearance or the safety of the community.

17           Ms. Bell has absolutely no criminal history

18   whatsoever.  The -- as we've said in our submissions we

19   will not get into the specifics of the weight of

20   evidence at this point.  We fully expect this at this

21   point to go to trial and we -- and respectfully I

22   believe that the evidence is -- is fairly weak in this

23   case.

24           And in addition Ms. Bell has basically none of

25   the risk factors anymore.  I mean she doesn't have a

1   passport anymore.  She's willing to agree to -- she's

2   willing to agree to not apply for additional travel

3   documents.  She worked for nine years at Morristown

4   Medical Center as a clinical research coordinator.  I

5   believe that if she were an unreliable person or

6   someone who counted on, she wouldn't hold that job for

7   so long.  She's taught for several years a biology

8   professor.  She mentors students at William Paterson.

9   She has strong community ties, strong family ties,

10  absolutely no history of violence.  We believe that so

11  far, the discovery that we've seen does not make out

12  the elements of this offense.

13          I respectfully believe given how long this

14  case will be gestating and given the absence of risk

15  factors of non-appearance and danger to the community

16  that Ms. Bell should be released as soon as possible in

17  the least number of restrictions as possible.

18          THE COURT:  Okay, Mr. Sovolos.

19          MR. SOVOLOS:  Your Honor, thank you.  I -- I

20  would like  few moments because I'd like to go over how

21  we've gotten here.

22          THE COURT:  Okay.

23          MR. SOVOLOS:  And  I know a lot of it is

24  repeat but quite frankly and respectfully to defense

25  counsel I haven't heard anything new presented that

1   changes the arguments that were relied up in my -- in

2   the government's opinion for the -- for the decision to

3   not grant bail.

4          And also -- I also -- the new information that

5   I have received from defense counsel, including the

6   fact that he intends to -- you know, there's no

7   prospect for a plea agreement, which is the basis for

8   the delay in indicting, changes the government's

9   posture.  So given that information we do intend to

10  indict.

11         And I'm going to speak briefly in a moment on

12  how those sentencing exposures would change because the

13  Government has a case to make against the defendant for

14  not only the current charge that's before the Court,

15  but also the material support to a foreign terrorist

16  organization under the 18 United States Code 2339B.

17         So, I'd start of by saying Judge --

18         MR. SHARMA:  I would just like to briefly

19  interject Mr. -- that -- that --

20         THE COURT:  No -- no Mr. Sharma.  Mr. Sovolos

21  go ahead.  I'll give you a chance, you know that.

22         MR. SOVOLOS:  Thank you Your Honor.  So we'll

23  -- we'll start off with, again, agreeing with pre-trial

24  recommendation that the defendant should continue to be

25  detained.  And I think the critical question before us

1  today, less than a month after the original bail

2  hearing is, what's new?  And I have several items that

3  are new, and each one of these items further undercuts

4  the defense counsel's position.

5       The first thing that's new is the itinerary of

6  the defendant that was provided today that shows, at

7  least in one version of the itinerary, the defendant

8  expected to travel from Cairo to Istanbul on Egypt Air

9  735.  Now, that to me is relevant because the defense

10  counsel has also made relevant.  He stated Bell was not

11  on her way to Turkey on the day of the arrest.  I've

12  had a chance to look at the submission defense counsel

13  provided a minute before we got on this -- on this

14  call, and I know he makes an issue of that.  But that

15  is the purpose of providing that itinerary.

16       And with respect to the 2019 chat that I'm

17  going to discuss in greater detail in a few moments.

18  That 2019 chat shows that Bell intended to travel at

19  the first available opportunity.  She discusses a

20  restriction she has in traveling.

21       So, the evidence shows so far that the

22  pre-trial report shows that in 2017 the defendant

23  traveled to Turkey.  In 2018 in November she was

24  stopped when she was attempting to travel to Turkey to

25  meet with the member of this foreign terrorist

1  organization.  In 2019 you have a chat before you

2  counsel that shows that she intended to travel to

3  Turkey again and meet with this member of the foreign

4  terrorist organization and in 2020 she was stopped at

5  the airport on her way to go to Turkey, as the

6  itinerary today showed.  So that's one batch of

7  information.

8          The second batch of new information relates to

9  the weapons.  On the date that the Court considered the

10  135 approximate weapons that were recovered we didn't

11  know that they were operable.  To date the FBI

12  indicates that the preliminary tests of all these

13  weapons shows that they are operable.  On the date of

14  our --

15          Yes judge?

16          THE COURT:  You froze for a second.

17          MR. SOVOLOS:  Okay.

18          THE COURT:  So, 135 weapons and today you're

19  aware --

20          MR. SOVOLOS:  There's not a specific number,

21  they want to get operability tests on each one, but not

22  one of them has shown to be inoperable.  And the photos

23  that I provided to the Court show that although some of

24  them are older weapons, there are many including

25  handguns that are easily concealable that are just

1   straight up handguns Judge.  The type of handguns that

2   you see every day before you across the board that

3   violent criminals are using.

4          The def -- the Government is not making an

5   allegation beyond the fact that Ms. Bell had these

6   weapons in her home on the date of the arrest.  Nothing

7   more, nothing less.  And the person that had those

8   weapons are being charged with the -- the conduct

9   that's outlined in a 26 page complaint that is put

10  before the Court.

11         Now, we know they're operable.  We know

12  they're not antique and we know that they weren't

13  stored in a way that indicates that they were preserved

14  as if they were antique type weapons even if they

15  perhaps weren't meeting the technical definition of an

16  Antique Weapon -- of an Antique weapon.

17         So, given those three new facts related to the

18  weapons the government's position is even stronger

19  today than it was in the initial hearing that we had on

20  bail.

21         Now, I could speak a moment about the genesis

22  of the case, because it sounds like defense counsel is

23  quite frankly dismissive of providing material support

24  to a foreign terrorist organization that's designated

25  as such for the national security threat it poses to

1  our country.  And that's why we're here today, because

2  his client provided not just advice and guidance, which

3  is arguably nebulous in the -- as suggested by defense

4  counsel, but she provided real money in the thousands

5  of dollars.  That we provided the full Western Union

6  records to defense counsel that show unequivocally

7  this money was sent over to Turkey and it was

8  ultimately sent from Turkey to Syria.

9          Now, how do we know that happened?  Because we

10 use the defendant's own words.  And how do we know that

11 happened?  Because Western Union records indicate that

12 that happened.  And we also have the account of the

13 terrorist including -- including terrorist family

14 members that acknowledge receipt of that money.

15         So, on that facet alone, notwithstanding

16 defense counsel dismissing the evidence in this case, I

17 think that the evidence is incontrovertible.

18         Now, the defense counsel points out a couple

19 of things.  He talks about the time line that these

20 weren't her guns, that they were her husband's guns.

21 And I think that one thing I'd like to point out is, in

22 the defense counsel's submission he references that the

23 defendant's husband passed away in 2013.  And I'd like

24 to point out that that's a seven year gap between the

25 passing of her husband and where we are today.  And the

1  -- the November recovery of 135 firearms.  In those

2  seven years every single year Ms. Ball made a decision

3  not to sell those weapons.

4          And I also think we glean a little bit of an

5  insight from the chats that were included -- some of

6  which were included in the complaint, where Ms. Bell

7  talks about having financial difficulties and needing

8  money.  Specifically she talks about on May 8, 2017 she

9  stated that, "The guns are very expensive and remember

10 my limits on money, half must be saved for a new

11 house."  And Judge that's just one of several instances

12 where Ms. Bell complains about not having money.  So

13 that begs the question, given the new information that

14 defense counsel has given us, why did she feel the need

15 to hold on to these guns for seven years when she

16 intended to sell them according to what defense counsel

17 has proffered.

18         Now, I also want to say -- make one last point

19 about the context.  We see in the chats not just a

20 passing reference to providing support to an individual

21 who's a terrorist and an organization that's a foreign

22 terrorist organization, we see a long term deeply

23 committed sustained commitment to providing the support

24 through advice, through guidance, through emotional

25 support and ultimately through thousands of dollars

1  that are provide to this guy.  And that's month after

2  month, year after year, over the span of these years.

3            That 2019 chat that defense counsel dismisses

4  shows that she continues to communicate with this

5  terrorist well past the conduct that's charged in this

6  date and it's something we're looking into.  So, I'd

7  ask the Court to consider that as well when they factor

8  in the -- the claim that defense counsel has made that

9  the conduct perhaps doesn't exceed November of 2018.

10           And I'd also remind the Court, Judge, that Ms.

11  Bell talks about giving money to this individual after

12  he very clearly stated, not a benign motive or not a

13  political motive, but a very antagonistic aggressive

14  intent to take revenge on the U.S.

15           On April 6, 2017 in a communication with the

16  defendant after discussing U.S. Support for the

17  Syrian's regime which HTS and other groups were

18  fighting at the time User One stated, "We will take

19  revenge on the U.S. if the U.S. strikes airports in

20  Syria."  Now, in that communication this defendant

21  said, "I live very close to New York and I'm connected

22  to many revolutionaries,"  and the redaction there

23  refers to a certain platform that she was using.

24           So, she specifically cites not only her

25  support for a foreign terrorist organization but to

1  revolutionaries in the area.  Now, I don't know the

2  exact meaning of that, but I know that given the

3  context that everything she did, month after month,

4  year after year, that's pretty concerning.

5        So, the evidence was overwhelming before we

6  executed a search warrant on her house, and we sit here

7  today having found 135 guns, a ton of ammunition that's

8  shown in those photos.  And beyond that from the

9  original bail hearing Judge, where Your Honor found

10 that the defendant should be retained, we now know that

11 these guns are operable, they're not antique, there's a

12 ton of weapons -- of ammunition that could have been

13 used and that from 2017, 2018, 2019 and 2020 we can

14 substantiate either that she traveled to Turkey or she

15 intended to travel to Turkey every year from 2017 to

16 when she was arrested.

17        And I'd also point out that what stopped her

18 from traveling was not her lack of intent.  It was that

19 she was not allowed to travel on an international

20 flight.  And she was taken off that list in 2020 and

21 where does she go?  In 2020 we have an itinerary that

22 we provided that shows her going to Syria -- I'm sorry,

23 to Egypt and then to Turkey.  So every single year

24 she's tried to travel to Turkey.

25        And finally Judge, I want to refer back to

1  what defense counsel suggested with regards to, you

2  know, not being open -- suggesting that he's not open

3  to a plea.  Given that new information the Government

4  intends to indict this case as soon as there's an

5  available grand jury.  And I would point out that

6  contrary to what defense counsel claims in his letter

7  on December 17 where he claims that if the defendant

8  was, "convicted of a charge at trial the U.S.

9  Sentencing Guidelines would recommend a sentence, at

10  most, 51 months in prison."

11         Now, I know from my experience doing cases

12  like this and my analysis of the guidelines on this

13  case that is false.  And I'm not the expert on this,

14  and I will -- I will rely on the experts.  But I will

15  tell you that our analysis indicates -- indicates that

16  the penalty under 18 U.S.C. 2339B, providing material

17  support to a foreign terrorist organization which would

18  just by virtue of sending that money over to a foreign

19  terrorist organization be satisfied, has a maximum

20  sentence of 20 years.  And given that the defendant

21  would have the specific offense  characteristic that I

22  provided to defense counsel of 2M5.3B2 which would add

23  from -- it would take the offense level from a 26 to

24  28, based on her providing funds with the intent,

25  knowledge or reason to believe that such funds would be

1   used to purchase any of the items described in sub --

2   subdivision A.  And subdivision A, Judge, is dangerous

3   weapons, which we've seen an abundance of in the

4   complaint.  She would be at an offense level 28.

5           And then beyond that the Government intends to

6   seek a terrorism enhancement of U.S.S.G. section 3A1.4A

7   also provided to defense counsel which would add 12

8   points to the offense level of 28 bringing the

9   guidelines range with that terrorism enhancement of 360

10  to life.  Judge, without that terrorism enhancement the

11  range would be 140 months to 175 months at an offense

12  level of 28.  And the Government's confident we can

13  satisfy these burdens and the -- the -- these

14  guidelines, also Judge, apply to the current charged

15  offense.  The only difference is that the maximum

16  penalty on the current charge -- on the current charge

17  is 10 years.  So, that would be the only difference.

18          THE COURT:  So, is she charged in 2339A now?

19          MR. SOVOLOS:  No, she's charged with 2339C

20  Judge.

21          THE COURT:  C, okay.

22          MR. SOVOLOS:  Which has a ten year statutory

23  maximum.

24          THE COURT:  Yeah, okay.

25                  (Pause in proceedings)

Bail Hearing                                                        16
20-mj-09451

1          THE COURT:  Mr. Sharma did you want to

2    respond?

3          MR. SHARMA:  Oh yes, yes.

4          So, first of all I don't understand why the --

5    why the Prosecutor is saying that even without this

6    enhancement.  This enhancement that very rarely

7    applies.  The guidelines range would 140 to 175 months.

8    He and I have actually emailed about that and I told

9    him actually it would only be 140 to 175 months at

10   offense level 28 if she is at criminal history category

11   6.  But Ms. Bell because she  has zero criminal history

12   would be at criminal history category one.  And -- and

13   the prosecutor, at least in email, told me I was

14   correct and it would be 78 to 97 months.  So, I don't

15   know where -- why the prosecutor is repeating this

16   falsehood that it would be 140 to 175 months at offense

17   level 28.

18         Perhaps the prosecutor can enlighten us.

19         MR. SOVOLOS:  Can I Judge.  I -- I spelled

20   this all out in an email to defense counsel, and I

21   think I may have misread his response.  But the

22   criminal history category six is mandated once you

23   reach this enhancement, in my understanding.  So, while

24   she's a category one on the current charge if you

25   achieve this enhancement it would be a category six.

1        Now, either way even at an offense level 26

2   the range is 120 to 150 months, Judge.  So, it's

3   significantly more than what defense counsel claim at

4   51 months which -- which quite frankly is ludicrous and

5   on its face, not true.

6        MR. SHARMA:  We'll let the District Judge

7   decide that Judge.

8        THE COURT:  Yeah, I don't think we have to

9   argue that.

10       MR. SHARMA:  It's enhancement would -- if it

11  applied would automatically 12 offense levels to the

12  calculations, so there would no way for her to be 28

13  offense level and criminal history category 6, as I

14  would hope the Prosecutor would understand by now.

15       Look, much of the Prosecutor's argument is

16  that we haven't introduced anything new.  I -- I

17  respectfully disagree.  When we had the hearing on this

18  on November 25th, I didn't have a series of affidavit

19  talking about exactly what Ms. Bell has said about her

20  intentions to move to Turkey someday, exactly what is

21  the situation with the guns and this anti-tank rocket

22  launcher, that sounds very scary.  And so that is why I

23  have gone to tremendous lengths to provide all of that

24  information to the Court.  So, I respectfully disagree

25  the Government that this is not new information.

1           One thing -- I mean look, throughout the

2    government's recitation of the facts in this case and

3    throughout their criminal complaint and their press

4    release, throughout this case Your Honor, they're

5    omitting critical facts.

6           Okay so here's two facts.  I'm not -- I don't

7    want to get into -- into the weeds about the weight of

8    the evidence.  This Court frequently releases -- all

9    federal courts routinely release people on bail who --

10   who have overwhelming evidence against them.  Because

11   the -- because the standard is what -- whether they

12   pose a risk of flight or a danger to -- danger to the

13   community while they are presumed innocent.  Okay, and

14   so Ms. Bell is presumed innocent.  And I can tell Your

15   Honor that the -- that the Government's recitation of

16   various text messages and facts in this case is

17   terribly cherry picked and we will answer it at trial,

18   and we will answer it with pleasure if it leads to

19   trial.

20          Now, Ms. Bell may accept a plea agreement.  I

21   don't know.  We haven't seen all the discovery yet, but

22   at least what I have seen so far, I'm not seeing a

23   smoking gun.  So, let's move on to the -- let's move on

24   to the other points that the Government makes.

25          They say, oh Your Honor she didn't fly to

1 Turkey because she had all these restrictions against

2 her.  Yeah, she was on the no fly list.  She didn't try

3 to -- she didn't try to violate that in any way.  That

4 goes in -- she -- she challenged it through -- through

5 the proper channels, through legal channels and she got

6 off the no fly list in 2020.  And in fact I can show

7 the Court, if the Court wishes to see everything that

8 we discuss in our affidavits we -- I have evidence for.

9 I did not wish to inundate the Court with even more

10 documentation.  But if the Court wishes I can show the

11 Court the letter that she got saying you are off the no

12 fly list.  And it says, I'm sorry there's been a

13 misunderstanding.  Sometimes people get on this list

14 for reasons we don't understand, you're now off the

15 list.  You can fly wherever you want.

16          And the Prosecutor makes it seem so nefarious

17 that she wanted to go to Turkey then.  Yeah, she loves

18 Turkey.  There's -- I -- I love certain countries, she

19 loves certain countries.  There's -- unless you're

20 going to have this very sort of orientalist idea that

21 certain countries are bad countries to go to then I

22 don't see what the problem is with Ms. Bell loving

23 Turkey and liking going there.  I put --

24          THE COURT:  What about -- what about this

25 transfer of funds?

1           MR. SHARMA:  Yeah, so let's talk about that

2   Your Honor.

3           THE COURT:  Right.

4           MR. SHARMA:  She transferred -- over the

5   course of two years she transferred a total of just

6   over $3,000 to this "terrorist fighter."  Now, she

7   transferred money to him, about $200 at a time.  The

8   government says oh she gave him money that he said he

9   needed for a gun.  That was, first of all, in 2017

10  before it was designated as foreign terrorist

11  organization.

12          Secondly, he said and the government omits

13  this every time they talks about it, it's perfect.  He

14  says twice, I need it for self defense.  He calls --

15  then when he talks about his organization HTS he says

16  we're Trump soldiers; we love Trump.  And she says, oh

17  yeah, he -- he seems good.  He seems better than Obama

18  about these sorts of issues.

19          Okay, so there's no -- Ms. Bell, as you can

20  see from the affidavit, she's a patriot, she loves

21  Turkey because she loves the spa and shopping there.

22  That is what she goes there for.

23          THE COURT:  But why did she send the money?

24  That's the --

25          MR. SHARMA:  Okay so she sent the money

1   because he said he needed money for various items.  He

2   never -- he never said I want to give this to HTS or

3   this is for HTS.  And in fact there's text messages

4   where he says -- he says I've now re-joined HTS.  And

5   she was sending him money -- she was sending him money

6   before he re-joined the organization.

7         So, at no point was this money tied to

8   supporting the organization.  It was tied to supporting

9   this person.  And under case law the Government will

10  have to prove not only that she supported a person

11  within HTS that her support was intended to support HTS

12  itself.

13        THE COURT:  Well, what -- what's her

14  relationship with this person?

15        MR. SHARMA:  Well see this is something for us

16  -- that we will get into if this goes to trial Your

17  Honor.  Ms. Bell has a history of relationships with

18  people -- with people online and who she has not met,

19  and who she feels very close to.  And it has --

20        THE COURT:  People from the United States?

21        MR. SHARMA:  People from -- I have heard about

22  someone from the Bahamas, about someone from Mexico,

23  this is a long running issue in Ms. Bell's life where

24  she falls in love in a manner of speaking with certain

25  people.

1          THE COURT:  And does she send --

2          MR. SHARMA:  This is totally platonic.

3          THE COURT:  -- to other people?

4          MR. SHARMA:  I'm sorry?

5          THE COURT:  Does she send money to other

6    people?

7          MR. SHARMA:  She has, yes.

8          THE COURT:  Where?

9          MR. SHARMA:  She has sent -- she has sent

10   money and items to someone in the Bahamas.  This was

11   well before this case, who she was infatuated with.

12   There's additional information, but -- but this is --

13          THE COURT:  So -- so  you're telling me that

14   this --

15          MR. SHARMA:  -- for us to talk about at trial

16   if this goes to trial.

17          THE COURT:  -- person in -- in Turkey that she

18   was sending to -- was it a Turkish --

19          MR. SHARMA:  No, she was sending -- she was

20   sending money to someone in Turkey in order or to be

21   given to someone in Syria because --

22          THE COURT:  Okay.

23          MR. SHARMA:  -- there's no -- there's no

24   Western Unions --

25          THE COURT:  Okay.

1          MR. SHARMA:  -- in Syria.  That's not the way

2   it works.  So --

3          THE COURT:  So, she did not even know this

4   person in Syria or she knew this person in Syria?

5          MR. SHARMA:  She knew -- she knew him.

6          THE COURT:  And she sent money to Turkey

7   because she can't send money to Syria?

8          MR. SHARMA:  Correct Your Honor.

9          MR. SOVOLOS:  Judge, I agree on that last

10  fact, and if I may be heard more generally.

11         MR. SHARMA:  I have more to say but I don't

12  know --

13         THE COURT:  All right, go ahead Mr. Sharma I'm

14  sorry.

15         MR. SHARMA:  Okay, so the Government also

16  says, oh there's this seven year gap that Richard

17  Magera died in 2013.  Every years she had these --

18  every year these guns weren't sold was a year that she

19  was deciding not to sell them.  Wrong.  She had no

20  right to sell them.  She -- it was -- the guns belonged

21  to her children as we tried to make clear in the

22  affidavits.  And the government repeatedly says our

23  affidavits don't give any new information.  Well maybe

24  if they read the affidavits it would provide new

25  information, because that is exactly what we say.  That

1  --

2           THE COURT:  I read the affidavits.  I still

3  have a problem.  I -- I have a very large problem when

4  a mother keeps a stash of 135 guns and ammunition.

5  Didn't even call the police to say can you take this

6  ammunition.  I said this last time.  If somebody broke

7  into that house it would be terror on the streets

8  because of a 135 weapons and -- and ammunition.  I

9  don't understand how a person with any sense whatsoever

10 doesn't make arrangements with her sons, her children

11 to get rid of the guns if she had no interest in the

12 guns.

13          MR. SHARMA:  She was attempting to do that

14 Your Honor.  She was --

15          THE COURT:  Seven years.

16          MR. SHARMA:  I'm sorry?

17          THE COURT:  Seven years.

18          MR. SHARMA:  Well, first of all that -- they

19 were moved into her house at the end of 2017 as we

20 described in the affidavit.

21          THE COURT:  Okay, so let's take it from 2017

22 to 2020.

23          MR. SHARMA:  Three.

24          THE COURT:  Are you telling me if somebody

25 gave you 135 guns and live ammunition that you would

1    put it in your basement and do nothing else about it?

2           MR. SHARMA:  Your Honor --

3           THE COURT:  I don't understand that at all.

4           MR. SHARMA:  What I would -- okay, Your Honor

5    what I would do is -- is not germane here.  Okay,

6    because what I would do as someone who has never

7    touched a gun and who did not grow up around them and

8    did not spend years around Richard Magera and a house

9    full of them and did not have sons who inherited them

10   is irrelevant.  I would be terrified if I saw a gun,

11   because that is the environment, I grew up in.  Okay --

12          THE COURT:  I'm talking about common sense Mr.

13   Sharma.  Common --

14          MR. SHARMA:  I --

15          THE COURT:  -- every day sense.

16          MR. SHARMA:  I understand, but I -- I fail to

17   see Your Honor how -- first of all she is fine with

18   being rid of these guns, she has tried to do that and I

19   can present to the Court --

20          THE COURT:  That's today, that's not

21   yesterday.

22          MR. SHARMA:  I'm sorry?

23          THE COURT:  We're making a decision -- I'm

24   making a decision on bail not based upon today, not

25   based upon she would have, she could have, and might

1   have, but the fact that she had 100 -- I mean 135

2   weapons in her home.  I -- I just -- it just makes no

3   sense to me whatsoever.  What makes sense to me is that

4   she didn't want to get rid of them.  She didn't push

5   her sons to get rid of them.  Why?  I don't know.  I'm

6   not going to speculate on the facts on this case or the

7   lack of facts.

8           MR. SHARMA:  But Your Honor --

9           THE COURT:  I am going to say this, whatever

10  argument you're going to make, I don't think you're

11  going to convince me.  135 guns and weapons and

12  ammunition -- live ammunition in somebody's basement,

13  not locked up is just an act of unreasonableness.  And

14  what can I draw from that?  Nothing, other than to me

15  it is a danger to the community that somebody had a 135

16  weapons and ammunitions unsecured in their home.  That

17  in and of itself is a danger to the community.  The

18  same point I made when you last argued this.

19          I respect that her sons have inherited the

20  guns.  I do not respect that a human being disregards

21  the safety of the neighborhood, the safety of her

22  neighbors, of her -- her family, her friends by leaving

23  135 guns in a basement.  I don't understand that.

24          I don't know the terrorist links.  I haven't

25  seen all the Government's evidence, nor have you, nor

1   have I seen your defense.  But two things bother me.

2   The fact that somebody would house 135 weapons in their

3   basement, unsecured.  And the fact that there was money

4   sent from Turkey to Syria to somebody who was a known

5   terrorist.  Now what do you -- you wear the judge robe.

6   What do you make of that?

7          MR. SHARMA:  Sure -- sure Your Honor let's --

8   let's talk about it.  Okay, I ask Your Honor to please

9   keep an open mind still.  Okay, because the issue here

10  is whether there's any combination of conditions -- any

11  combination of conditions that would reasonably assure

12  the safety of the community here.

13         Okay, what Ms. Bell may -- whatever poor

14  decision making she may have done -- she did try to

15  sell these guns, first of all.  She did pressure her

16  sons, as the affidavit state and as text messages show

17  and I couldn't produce them to the Court and I can

18  still produce them right now, text messages where they

19  said, Hey are you going to talk to that guy about --

20  about seeing these safes and getting rid of this stuff.

21  We have those.

22         THE COURT:  That can either way.

23         MR. SHARMA:  But it's -- it's evidence to --

24  it's evidence that respectfully refutes the Court's

25  claim that she wanted to keep the guns.  She never

1   wanted to keep the guns.  Now it may have been in

2   something that she didn't give enough urgency to get

3   rid of them Your Honor, but she never wanted to keep

4   them.  There's no evidence of that.

5          Her sons say she wanted -- she -- she took

6   them only as a favor.  They say that she repeatedly

7   said, I would like the space in my basement back can

8   you please get rid of these safes and get rid of

9   everything.  And she -- I have a text message from her

10  from early November, well before her arrest in this

11  case where she says, hey what's going on with that?

12  Okay where -- where she says --

13         THE COURT:  What's going on with what?

14         MR. SHARMA:  What's going on with the guy who

15  said that he is interesting in taking -- in looking at

16  these guns and purchasing them.  Okay, it was a gun

17  dealer.  And so I have that text message from well

18  before her arrest.

19         THE COURT:  And the gun dealer is identified?

20         MR. SHARMA:  The -- it's in the -- it's in the

21  -- the -- yes, it's in the -- it's in the affidavit I

22  submitted as an exhibit.  It's the only exhibit I

23  submitted as one of the affidavits and it talks about

24  Evan Nappen a gun lawyer.  If you Google him he

25  specialize in gun law in New Jersey and it was someone

1   that the family was in touch with that Mr. El Malegi

2   (phonetic) who is on the call right now --

3           THE COURT:  I  see.

4           MR. SHARMA:  -- was in -- they were in touch

5   with him in January and February to get rid of the

6   guns, but then the pandemic hit.  Every single part --

7   every single part of this -- and this is why I have

8   explained all of this in the affidavit.

9           It was -- it was Luke's responsibility to get

10  rid of this.  Their -- her number one thing was I want

11  it gotten rid of in a way that honors dad, that's it.

12  And they were trying to do that and they -- and they

13  failed.  They 100 percent failed.  They should have

14  done it sooner and -- and that is why Luke has regrets

15  it so much, and he has talked to me about it, and he

16  talks about it in the affidavit.  He regrets not making

17  this the priority that his mom asked him to make it.

18  Okay.

19          And yes, it endangered the community and that

20  is not acceptable at all.  At all.  I'm not going to

21  argue that it is.  I would be terrified if I found out

22  that my neighbor has 135 guns that they're keeping, for

23  whatever reason.

24          But the issue here on bail, under the Bail

25  Reform Act is; is there any combination of conditions

Bail Hearing                                                        30
20-mj-09451

1  that the Court can impose that will reasonably assure

2  her appearance and reasonably assure the safety of the

3  community?  Her making a terrible decision to keep

4  these guns in her house as a favor to her son -- as a

5  favor to her sons and to not sell them immediately, or

6  not sell them fast enough or whatever the Court may

7  think is the problem, does not mean there is no

8  combination that would not reasonably assure the safety

9  of the community moving forward.

10         We have people -- I have clients who are

11  charged with a felony possession who were previously

12  convicted of felony possession and get out on bail for

13  felony and --

14         THE COURT:  Did they have 135 guns with --

15  with ammunition?

16         MR. SHARMA:  No but they possessed --

17         THE COURT:  Did they send money to known

18  terrorists?

19         MR. SHARMA:  I'm sorry?

20         THE COURT:  Did they send money --

21         MR. SHARMA:  Okay, so I want to talk -- I want

22  to talk about that second -- that second part Your

23  Honor.  Part of our defense -- I really didn't want to

24  get into our full defense, but part of that defense

25  will be that exact phrase known terrorist.  The

1   government knows this person is a terrorist, that does

2   not mean Ms. Bell knew that.  Okay, and the Government

3   will have to prove it -- well the Government can laugh

4   all they want -- the Government will have to prove

5   that.

6           THE COURT:  Well, let's not get personal.

7           Mr. Sharma I appreciate your passion.  I am

8   denying your motion.  I am completely unconvinced that

9   there are any set of conditions that can assure the

10  safety of the community, whether or not the guns are in

11  the house or not.

12          Three years of a poor decision endangered a

13  community.  I am not going to speculate that there's

14  more or less.  I'm not going to speculate she supports

15  a terrorist, that's for a finder of fact.  It is

16  somewhat odd that money's going especially from Turkey

17  to Syria to support maybe an unknown terrorist,

18  somebody that's in this organization that you've

19  already named that you found out was in this

20  organization.  Life means be careful.

21          I understand that she was on the no fly zone

22  -- list.  I have no idea why.  Nobody's presented me

23  with any information was on it.  I appreciate it that

24  she  legally tried to get off the no fly list.  That's

25  very nice.  I am not releasing her.  There are no sets

1   of conditions.  And the affidavits that the sons

2   provided are very nice but they do not convince me that

3   the community will be safe.  So your motion is denied.

4            Thank you.

5            MR. SHARMA:  Thank Your Honor.

6

7                 (Conclusion of proceedings)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bail Hearing                                                          33
20-mj-09451

1

2

3

4                          Certification

5

6

7        I, JESSICA ROBINSON, Transcriptionist, do hereby

8    certify that the pages contained herein constitute a

9    full, true, and accurate transcript from the official

10   electronic recording of the proceedings had in the

11   above-entitled matter; that research was performed on

12   the spelling of proper names and utilizing the

13   information provided, but that in many cases the

14   spellings were educated guesses; that the transcript

15   was prepared by me or under my direction and was done

16   to the best of my skill and ability.

17        I further certify that I am in no way related to

18   any of the parties hereto nor am I in any way

19   interested in the outcome hereof.

20
21   /s/JessicaRobinson                    12/31/20
22   Signature of Approved Transcriber          Date
23   Jessica Robinson, AOC #581
24
25   King Transcription Services
26   3 South Corporate Dr.
27   Suite 203
28   Riverdale, N.J. 07457
29   (973) 237-6080

# EXHIBIT 3

# facebook

Log In



**New Jersey Libertarian Party**
April 25, 2018 · Sparta, NJ · 

North NJLP Chair Maria Bell and Tosone for Congress
— at **Krogh's Restaurant & Brew Pub**.

👍 1                                                                    1 Comment

| Like | Comment | Share |

Most Relevant

**Krogh's Restaurant & Brew Pub**
Thank you for having your party gather here! We enjoyed serving you and hope to do so
again soon!



## See more of New Jersey Libertarian Party on Facebook

Log In        or        Create New Account